# EXHIBIT   A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AFFYMETRIX, INC., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| vs. | ) Civil Action No. 04-901-JFF |
| | ) |
| ILLUMINA, INC., | ) |
| | ) |
| Defendant/Counter-Plaintiff | ) |
| | ) |

## ILLUMINA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION
## OF DOCUMENTS AND THINGS TO AFFYMETRIX, INC.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Illumina, Inc. ("Illumina") hereby requests that Affymetrix, Inc. ("Affymetrix") produce for inspection and copying the following documents and tangible things in accordance with its obligations under the Federal Rules of Civil Procedure and the Definitions and Instructions set forth below, within 30 days of service, at the offices of Kirkland & Ellis LLP, 555 California Street, San Francisco, California, 94104, or at a time and place mutually agreed to by the parties.

## REQUESTS

**REQUEST NO. 1:**

Documents sufficient to identify Affymetrix's policies and procedures for generating, maintaining, and disposing of its documents, including but not limited to policies and practices regarding generating, maintaining and disposing of patent applications and prosecution files, or any scientific or technical references related to such files.

- 1 -

**RESPONSE TO REQUEST NO. 1:**


**REQUEST NO. 2:**

All pleadings, transcripts, depositions of Affymetrix's witnesses, expert reports and documents produced by Affymetrix to the opposing party(ies) in all actions identified in the Response to Interrogatory No. 6, including but not limited to actions involving the following parties:

      a.      Oxford Gene Technology Ltd. v. Affymetrix, Inc.

      b.      Affymetrix, Inc. v. Synteni, Inc. and Incyte Pharmaceuticals, Inc.

      c.      Affymetrix, Inc. v. Hyseq, Inc.

**RESPONSE TO REQUEST NO. 2:**


**REQUEST NO. 3:**

Documents sufficient to identify Affymetrix's current organizational structure, including documents sufficient to identify Affymetrix's current and former officers, directors, and managing agents, by position and/or title.

**RESPONSE TO REQUEST NO. 3:**


**REQUEST NO. 4:**

All documents and things relating to any research, development and testing of any of the Affymetrix products and/or processes that Affymetrix contends practice, embody or incorporate the alleged invention(s) claimed in the Affymetrix Patents.

# EXHIBIT   B



Daniel R. Reed
Litigation Attorney
Direct Dial: 510.428.8520
E-Mail Address: Daniel_Reed@affymetrix.com

September 20, 2005

**VIA EMAIL**

Marcus Sernel
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

      Re:    *Affymetrix, Inc. v. Illumina, Inc.*
                <u>Civil Action No. 04-901-JJF</u>

Dear Marc:

      I write in response to your letter of September 19, 2005.

      Once again, Illumina misapprehends the relevant standards for discovery. It is not our obligation to point you to specific Illumina employees who were involved in the research and development of the accused products and services. Rather, we have properly requested all research and development work underlying those products and services, including laboratory notebooks. You have an obligation to produce that material and you refuse to do so. As a result, we have no option but to raise this issue with the Court.

      With regard to the other litigation material, we are not convinced that either the *Incyte* or *OGT* litigation material is relevant to this case. We are also not willing to agree to your proposal. We are willing, however, to agree to a "trade" whereby we produce the *Incyte* material in exchange for Illumina's production of the *Applera* litigation material. As I have previously pointed out, the latter material is without question relevant to this litigation (it involved the same technology accused of infringement in this case). Your attempt to dismiss it as "a dispute between contractual partners" entirely misses the point – the dispute centered on the same technology at issue in this case. Please let us know your response to this proposal. Alternatively, should you reconsider your position on the relevance of the Czarnik lawsuits – which we believe are directly relevant – our earlier offer remains on the table.

      You have failed to address the numerous other concerns about Illumina's document production raised in my last letter. Your suggestion that "most of [our] lingering concerns should be addressed through Illumina's next production of documents" provides us little comfort. First, you have failed to make this production within the time period you previously proposed – it is clear that Illumina is engaged in a strategy of delay. Second, your refusal to

6550 Vallejo Street
Suite 100
Emeryville, CA 94608
Telephone 510 428 8500
Fax 510 428 8583
www.affymetrix.com

Marcus Sernel
September 20, 2005
Page 2

answer specific questions I posed about particular categories of documents indicates that
Illumina intends not to comply with its obligations. Once again, I ask that Illumina supplement
its written document request responses and that you answer the specific questions I posed in my
last letter. Affymetrix reserves the right to bring each of these issues to the Court's attention in a
motion to compel. Your failure to address these specific concerns appears to be an attempt to
undermine the purpose of the meet and confer requirements of the law. Given that we are one
month from the October 20, 2005, status conference, we will regard any further failure to
supplement Illumina's written responses or answer the specific questions posed in my letter as an
indication that Illumina refuses to produce that specific category of documents.

Finally, your "astonishment" at the relative size of the document productions is
particularly disingenuous. As you have previously conceded, a large portion of Illumina's
document production was "non-substantive" filler, produced merely for strategic delay.
Furthermore, it is Illumina's technology that is accused of infringement, not Affymetrix's –
therefore, it is to be expected that Illumina would have more relevant documents to produce than
Affymetrix. To date, Illumina has failed to produce many of these documents.

Please let me know if you have any questions. If you plan to contact us between
September 21 and 23, please contact Mike Malecek at 510.428.8503.

Sincerely,

Daniel R. Reed
Litigation Attorney

# EXHIBIT   C

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of

**FODOR et al.**

Appln. No. 09/585,659

Filed: June 2, 2000

Group Art Unit: 1655

Examiner: S. Zitomer

FOR: PRODUCTS FOR DETECTING NUCLEIC ACIDS

\* \* \* \* \*

September 21, 2000

### FOURTH PRELIMINARY AMENDMENT
### SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT
### AND NOTICE OF LITIGATION

**RECEIVED**

SEP 2 5 2000

TECH CENTER 1600/2900

Hon. Commissioner for Patents
Washington, D.C. 20231

Sir:

Entry and consideration of the following amendment and remarks are respectfully requested prior to examination.

### IN THE SPECIFICATION:

Kindly amend the substitute specification as follows.

Page 1, line 4, after "This is a continuation of" insert --Appln. No. 09/362,089, filed July 28, 1998, pending; which is a divisional of--.

### REMARKS

Claims 26-69 are pending.

U.S. Appln. No. 09/362,089 is being added to the claim for priority benefit.

Applicants submit that no new matter is added to the original disclosure thereby.

Issuance of a corrected Official filing receipt is respectfully requested.

30098408_1.DOC                    1

FODOR et al. – Appln. No. 09/585,659

Attached herewith is a Form PTO-1449 listing references that should be considered during examination. In accordance with 37 CFR § 1.98(d), copies of the listed references are not provided because they were cited by the Office in U.S. Appln. Nos. 09/056,927 and 09/362,089, which are relied upon for an earlier filing date.

This IDS is intended to be in full compliance with the rules. But should the Examiner find any part of its required contents to have been omitted, prompt and early notice to that effect is earnestly solicited, along with additional time pursuant to 37 CFR § 1.97(f), to allow Applicants to comply fully.

Applicants are mindful of the large number of references that have been cited during prosecution of this application and have been provided to examiners involved in this and related applications. These references have come to Applicants' attention during multiple lawsuits involving patents that relate to the present application and the normal course of prosecution. Applicants have cited them to fulfill their duty of disclosure. In an effort to make reviewing these references manageable for the Examiner, Applicants have provided the PTO with multiple copies of two compact discs (CDs) with the references available for viewing or searching electronically.

Applicants' representative, Mr. Philip McGarrigle, has provided the CDs to Group Director John Doll, Supervisory Primary Examiners Michael Woodward and Gary Jones, and Special Program Examiner Cecilia Tsang. The CDs given to Messrs. Doll, Woodward, and Jones were for distribution to Individual Examiners within their respective groups. The CDs presented to Examiner Tsang were to accompany the hard copies of the references in the IDS which are in a central location in her office and are intended to be available to all examiners assigned to

30098406_1.DOC                    2

IAFP00001080

FODOR et al. – Appln. No. 09/585,659

these applications. The Examiner is invited to contact the undersigned if further copies are needed.

Of the two CDs that make up the IDS, one contains the articles/other documents and the other contains the patents/published patent applications. The CD containing the articles is in PDF format and can be viewed by selecting the appropriate article as discussed below. The CD containing patents has both a version with text and a version with appropriate figures. It is fully searchable and contains a program that has the ability to search for specific terms or to use Boolean logic to formulate more specific searches. There are links within each full text patent to the patents that are cited therein.

The vendor who prepared the patent CD suggests that the README.HTML file in the root directory of the CD be opened before use. It contains directions on how to use the CD, as well as a hyperlink to the patent list. The CD that contains the articles suggests that "Index" or "Index2" be opened to view the images. Lists of articles are provided as Forms PTO-1449 and can be opened by clicking on the hyperlinked number of the article in the left hand column.

Applicants would also like to inform the Examiner of *inter partes* matters that relate to this application. Two commonly owned patents U.S. Patent Nos. 5,744,305 and 5,800,992 have been involved in interference proceedings. Specifically, they were Interference No. 104,359 between commonly owned U.S. Patent No. 5,744,305 and Brown et al., U.S. Appln. No. 08/688,488, and Interference No. 104,358 between commonly owned U.S. Patent No. 5,800,992 and U.S. Appln. No. 08/514,875. Both interferences have been decided (subject to current appeal in the District Court of Northern California, Civil Case No. C99 21111-JF/EAI) by the USPTO in favor of real party in interest Affymetrix, the assignee of the present application. The Junior Party challenged the patents on the basis of lack of

30098408_1.DOC                3

FODOR et al. – Appln. No. 09/585,659

enablement and written description under 35 USC § 112, among other issues.
The Junior Party's initial position is set out in papers (with supporting information)
entitled "Request for Declaration of Interference, 37 C.F.R. § 1.608" in both
interferences. The initial response of the Senior Party and Patentee is set out in
papers (with supporting information) entitled "Fodor's Opposition to Brown's Rule
608(b) Request" in both interferences.

Furthermore, U.S. Patent Nos. 5,744,305 and 5,800,992 are the subject of
litigation (*Affymetrix, Inc. v. Hyseq, Inc.*, US District Court for the Northern District
of California, San Francisco Division, Civil Action No. C98-03192 FMS, and
*Affymetrix. v. Synteni, Inc. and Incyte Pharmaceuticals, Inc.*, US District Court for
the Northern District of California, San Francisco, Case No. C98-4508 FMS
(MEJ)). In the course of these proceedings, allegations of invalidity over prior art,
lack of enablement, lack of support and inequitable conduct (relating to duty of
candor, content of declarations under 37 CFR § 1.132, and arguments made
during prosecution) have been raised. These allegations are denied. Further,
oppositions have been filed against a related European application EP 619,321 in
the European Patent Office, and a revocation proceeding has been brought in the
United Kingdom against related patents GB 2,248,840 and EP (UK) 619,321.
Collectively, these proceedings have generated a considerable number of
references, which were cited on the information disclosure statement and CD-
ROMs discussed above. On request, Applicants can provide copies of litigation
documents that may be of interest to the Examiner, but have not done so at the
present time due to the extensive nature of the multiple litigations and papers filed
therein.

As provided by 37 CFR §§ 1.97(g) and (h), no inference should be made
that this information and the listed references are prior art merely because they

30098406_1.DOC                    4

FODOR et al. — Appln. No. 09/585,659

have been submitted for consideration. Furthermore, no representation is being made that a search has been conducted or that this statement encompasses all possible material information.

Consideration of the foregoing and attachments are earnestly solicited. The Examiner is invited to contact the undersigned if further information is needed.

Respectfully submitted,

Cushman Darby & Cushman
Intellectual Property Group of
PILLSBURY MADISON & SUTRO, L.L.P.

By _____ 43180
Paul N. Kokulis
Reg. No. 16773
Telephone: (202) 861-3503
Facsimile: (202) 822-0944

PNK/GRT
1100 New York Avenue, N.W.
Ninth Floor – East Tower
Washington, D.C. 20005

RECEIVED

SEP 2 5 200

TECH CENTER 1600/2900

IAFP00001083

# EXHIBIT   D

EXHIBIT 3 TO JOINT PRETRIAL ORDER

AFFYMETRIX' STATEMENT OF ISSUES
OF FACT THAT REMAIN TO BE LITIGATED

The following issues are submitted as issues of fact. To the extent that the issues of law set forth in Exhibit 5 of the Joint Pretrial Order incorporate issues of fact, Affymetrix incorporates them by reference. Affymetrix also incorporates by reference the portions of Exhibit 13 concerning Affymetrix' Statement of Intended Proofs which raise issues of fact.

Several motions are currently pending before the Court which may impact this Statement of Issues of Fact. If the Court decides any of the pending motions before trial, the scope of triable issues may change, and Affymetrix requests the right to amend or supplement this statement to the extent required by the Court's decisions on any pending motion.

The parties disagree as to whether certain issues are to be litigated as a part of this case. The disputed issues fall into two categories.

a) The first category is with respect to issues Affymetrix pled in its original answer, yet that OGT maintains are not a part of the case. These issues involve affirmative defenses originating from 35 U.S.C. § 112 and the defenses of unclean hands and inequitable conduct. In its Answer, Affymetrix plead invalidity generally stating in its Fourth Affirmative Defense, "The '637 patent is invalid and/or unenforceable, in whole or in part, for failure to satisfy the conditions of patentability set forth in . . . 35 U.S.C. § 112, including but not limited to lack of written description and lack of enablement." OGT contends that because Affymetrix did not specifically call out all bases for claiming invalidity under 35 U.S.C. § 112, the issues not specifically named are not a part of the case. However, all of the disputed issues are explicitly included in 35 U.S.C. § 112. Disputed 35 U.S.C. § 112 issues include: failure to claim what

-1-

the inventor regards as his invention, indefiniteness, failure to join a contributing co-inventor, and failure to disclose the inventor's best mode. Similarly, OGT contends that unclean hands and inequitable conduct are not a part of the case. In its Answer, Affymetrix pled in its Second Affirmative Defense that "Oxford Gene Technology's claim for relief is barred, in whole or in part, by the equitable doctrine of unclean hands." Further Affymetrix specifically called out "unenforceabilty" in its Fourth Affirmative Defense. Inequitable conduct originates from, and is in fact a form of, unclean hands and is grounds for a claim of unenforceabilty. Once Affymetrix had the benefit of discovery in this case it specifically and particularly pled the acts supporting its defenses of unclean hands and inequitable conduct to comport with the requirements of Federal Rule of Civil Procedure 9. Affymetrix properly pled all of the above mentioned defenses under the accepted federal notice pleading standard and thus contends that these issues are in this case and should be fully litigated.

b) The second category of disputed issues are those for which Affymetrix has sought leave to amend its Answer and counterclaims. Among these issues are the defense of patent misuse and counterclaims for tortious interference with contract, conspiracy to tortiously interfere with contract, unfair competition under Delaware and California law, and antitrust violations under the Sherman Act, Section 1. Affymetrix has submitted a statement of the issues of fact and law to be litigated and proposed jury instructions on all of these issues. OGT has declined to do so, maintaining that none of these issues are a part of the case.

I.    INFRINGEMENT

    A.    Infringement of Claim 1

       1.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which employ each and every limitation of claim 1 of the '637 patent, which reads as follows:

A method for generating an array of oligonucleotides of chosen lengths within discrete cells of a support material comprising the steps of

-2-

a) segregating a support material into discrete cell locations;

b) coupling a nucleotide precursor to a first set of cell locations;

c) coupling a nucleotide precursor to a second set of cell locations;

d) coupling a nucleotide precursor to a third set of cell locations;

e) and continuing the sequence of coupling steps until the desired array has been generated,

the coupling being effected at each location either to the surface of the support or to a nucleotide coupled in a previous step at the location.

2.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which infringe claim 1 of the '637 patent under the doctrine of equivalents, in that they perform substantially the same function in substantially the same way to accomplish substantially the same result.

B.    Infringement of Claim 3

1.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which employ each and every limitation of claim 3 of the '637 patent, which reads as follows:

The method of claim 1, wherein the size of each discrete cell is between an average size of 10 and 100 microns.

2.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which infringe claim 3 of the '637 patent under the doctrine of equivalents, in that they perform substantially the same function in substantially the same way to accomplish substantially the same result.

C.    Infringement of Claim 4

-3-

    1.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which employ each and every limitation of claim 4 of the '637 patent, which reads as follows:

> The method of claim 1 further comprising the use of means for coupling said nucleotide precursors to a particular set of discrete cell locations to the exclusion of other discrete cell locations.

    2.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes "means" which perform the identical function of "coupling said nucleotide precursors to a particular set of discrete cell locations to the exclusion of other discrete cell locations" in substantially the same way to accomplish substantially the same result as the rubber tubes disclosed in the specification of the '637 patent.

D.    Infringement of Claim 5

    1.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which employ each and every limitation of claim 5 of the '637 patent, which reads as follows:

> The method of claim 4, wherein the said means is a mask.

E.    Infringement of Claim 7

    1.    Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which employ each and every limitation of claim 7 of the '637 patent, which reads as follows:

> A method of analyzing a polynucleotide, by the use of apparatus comprising a support segregated into at least two defined cells, each cell having attached thereto oligonucleotides containing predetermined sequences, the oligonucleotides of each cell having been synthe- sized in situ and being attached to the surface of the

support through a covalent linkage, where the sequence of the oligonucleotides of a firsts cell is different than the sequence of the oligonucleotides of a second cell, which method comprises randomly degrading the polynucleotide to form a mixture of oligomers, the mixture being labeled to form labeled material, applying the labeled material under hybridization conditions to the support and observing the location of the labeled material on the support.

2. Whether OGT can prove, by a preponderance of the evidence, that Affymetrix utilizes methods which infringe claim 7 of the '637 patent under the doctrine of equivalents, in that they perform substantially the same function in substantially the same way to accomplish substantially the same result.

F. Reverse Doctrine of Equivalents

1. Whether Affymetrix' products are so changed in principle from the claimed invention that it would be unfair to hold Affymetrix liable for infringement of any form.

G. Affirmative Defense of License

1. Whether Affymetrix has a license under the '637 patent.

2. Whether the license rights of Beckman-Coulter Inc. ("Beckman") under the Isis-Beckman Agreement of April 17, 1991, as amended April 17, 1996, were assigned to Affymetrix pursuant to the Asset Purchase Agreement entered into by Beckman and Affymetrix.

3. Whether Beckman had a "business in products licensed" under the Isis-Beckman License Agreement as of June 5, 1999, as that phrase is used in Clause 16.2 of the Isis-Beckman License Agreement.

4.     Assuming that Beckman had a "business in products licensed" under the Isis-Beckman License Agreement as of June 5, 1999, whether Affymetrix succeeded to that business as a result of a sale.

5.     Whether Isis Innovations Ltd. and Beckman agreed in making the Isis-Beckman License Agreement, to condition Beckman's rights of assignment under Clause 16.2 on the existence of commercial sales of licensed products.

6.     Did Isis or OGT acknowledge that Beckman had the right to assign its license, even if it did not have commercial sales of licensed products, before there was a dispute over the meaning of Clause 16.2 of the Isis-Beckman License Agreement?

7.     Did Affymetrix without delay undertake directly with OGT to comply with the provisions of the Isis-Beckman License Agreement and to become in all respects bound thereby in place of Beckman?

8.     Whether any third party influenced OGT's decision not to grant a license to Affymetrix under Clause 9.2 or not to recognize the assignment of the license from Beckman to Affymetrix under Clause 16.2.

9.     Whether OGT unreasonably and in violation of its contractual obligations refused to honor the Affymetrix-Beckman transactions.

10.     When OGT initiated cross-license negotiations with Affymetrix in December 1997, did it act on its own (as it contends), or did it act pursuant to a plan with Hewlett-Packard and Amersham?

11.     Did OGT comply with the terms of its December 18, 1997, Letter of Intent with Affymetrix?

12.    In its license negotiations with Affymetrix starting in December 1997, did OGT conceal any material information, or otherwise act in bad faith?

H.    Willful Infringement

1.    Whether OGT has proven by clear and convincing evidence that Affymetrix had no reasonable basis for believing that it had a right to make, use or offer for sale the accused products.

2.    Whether Affymetrix has a reasonable basis to believe that it was entitled to a license under the '637 patent as a result of its Consortium Agreement with Beckman and Beckman's related request to OGT pursuant to Clause 9.2 for a license for Affymetrix.

3.    Whether Affymetrix had and has a reasonable basis to believe that it has a license under the '637 patent, or is entitled to such a license, pursuant to the assignment of the license from Beckman to Affymetrix.

II.    DAMAGES

1.    What is a reasonable royalty rate that would have been reached in a hypothetical negotiation between the parties held in December 1997.

2.    What Affymetrix revenues should be included in the royalty base to which the reasonable royalty rate is to be applied.

a.    Whether the reasonable royalty rate should be applied to all Affymetrix chip revenues, or only that portion of revenues from chips that are attributable to the contribution of the '627 patent.

-7-

      b.      Whether OGT is entitled to royalties on Affymetrix revenues derived from anything other than chips, such as instruments and service and support fees.

      c.      Whether OGT is entitled to royalties on any portion of Affymetrix' Easy Access Fees.

      d.      Whether OGT is entitled to royalties on chips used by Affymetrix for process improvement, research and development, and promotion purposes, for example.

      e.      The period of time for which OGT is entitled to royalties.

      3.      The amount of the up-front fee, if any, that would have been agreed to in a hypothetical negotiation between the parties held in December 1997.

      4.      The interest rate to be used for calculation of prejudgment interest, if any.

      5.      The cap on OGT's reasonable royalty damages by virtue of the cost of designing around the '637 patent.

      6.      Whether OGT, for breach of each of the allegedly infringed claims of the '637 patent, is entitled to royalties for chips used outside the United States.

      7.      Whether any injunction would be appropriate, given the public interest in access to Affymetrix' products.

III.    INVALIDITY

    A.    Anticipation

      1.      Whether any or all of the following prior art ("prior art") contains every limitation of claim 1 of the '637 patent:

-8-

Arnold, *et al.*, *Federation Proceedings*, 43(7), Abstract No. 3669 (1984), "A Novel Universal Support for DNA & RNA Synthesis"

Hayashibara Forum 1987 International Workshop on Automatic and High Speed DNA Base Sequencing

W. Bannwarth, *et al.*, <u>DNA</u> Volume 5 Number 5, 1986 "Laboratory Methods A System for the Simultaneous Chemical Synthesis of Different DNA Fragments on Solid Support"

Dattagupta, "Eucaryotic genomic dna dot-blot hybridization method" EP 0228075 A2

Dattagupta, "Rapid detection of nucieic acid sequences in a sample by labeling the sample" EP 0 235 726 A2

Dattagupta, "Assay for nuclieic acid sequences in a sample" EP 0281927 A2

Geysen, "Method of determining antigencially active amino acid sequences" WO 84/03564

Arnold, "Oligonucleotide Polymeric Support System" WO 85/01051

Geysen, "Method for Determining Mimotopes" WO 86/00991

Geysen, "Method for Determining Mimotopes" WO 86/06487

Saiki, "Immobilized Sequence-Specific Probes" WO 89/11548

Dattagupta, *et al.*, "Coupling of nucleic acids to solid support by photochemical methods" U.S. 4,542,102

Dattagupta, *et al.*, "Coupling of nucleic acids to solid support by photochemical methods" U.S. 4,713,326

Geysen, "Method for determining mimotopes" U.S. 4,833,092

Dattagupta, "Rapid Detection of Nucleic Acid Sequences in a Sample by Labeling the Sample" EP 0 235 726 A2

-9-

Dattagupta, "Rapid Detection of Nucleic Acid Sequences in a Sample by Labeling the Sample" EP 0 235 726 A3

Dattagupta, "Rapid Detection of Nucleic Acid Sequences in a Sample by Labeling the Sample" EP 0 235 726 B1

Dattagupta, "Immobilized Nucleic Acid Probe and Solid Support for Nucleic Acids" EP 0 130 523 A3

Dattagupta, "Eucaryotic Genomic DNA Dot-Blot Hybridization Method" EP 0 228 075 A2

Saiki, "Process for Detecting Specific Nucleotide Variations and Genetic Polymorphisms Present in Nucleic Acids and Kits Therefor" EP 0 237 362

Dattagupta, "Assays for Nucleic Acid Sequences in a Sample" EP 0 281 927 A2

Geysen, "Method of Determining Antigenically Active Amino Acid Sequences" WO 84/03564

Geysen, "Method for Determining Mimotopes" WO 86/00991

Geysen, "Method for Determining Mimotopes" WO 86/06487

Hamill "Apparatus for the Chemical Synthesis of Oligonucleotides" U.S. 4,728,502

Wallace, *et al.*, "The use of synthetic Oligonucleotides as hybridization probes. II. Hybridization of Oligonucleotides of mixed sequence to rabbit -globin DNA"

Dattagupta, *et al.*, "Assay for Nucleic Acid Sequences in an Unpurified Sample" U.S. 5,348,855

Bannwarth, W., "Gene Technology – A Challenge for a Chemist," CHIMIA 41, Nr. 9, 302-317 (1987)

Pirrung, *et al.*, U.S. Application Ser. No. 362901, June 7, 1989

    2.       Whether any or all of the prior art contains every limitation of claim 3 of the '637 patent.

-10-

3.     Whether any or all of the prior art contains every limitation of claim 4 of the '637 patent.

4.     Whether any or all of the prior art contains every limitation of claim 5 of the '637 patent.

5.     Whether any or all of the prior art contains every limitation of claim 7 of the '637 patent.

6.     Whether any or all of the prior art were known or used by others in the United States before Edwin Southern's alleged invention.

7.     Whether Edwin Southern invented the subject matter of the '637 patent.

8.     Whether there was a sale or offer for sale of the claimed invention before May 3, 1990.

B.     Obviousness

1.     Whether the alleged invention described and claimed in claim 1 of the '637 patent would have been obvious to a person of ordinary skill in the art in light of the scope and content of the prior art, the differences between the claimed invention and such prior art, and the level of ordinary skill.

2.     Whether the alleged invention described and claimed in claim 3 of the '637 patent would have been obvious to a person of ordinary skill in the art in light of the scope and content of the prior art, the differences between the claimed invention and such prior art, and the level of ordinary skill.

3.     Whether the alleged invention described and claimed in claim 4 of the '637 patent would have been obvious to a person of ordinary skill in the art in light of

-11-

the scope and content of the prior art, the differences between the claimed invention and such prior art, and the level of ordinary skill.

      4.    Whether the alleged invention described and claimed in claim 5 of the '637 patent would have been obvious to a person of ordinary skill in the art in light of the scope and content of the prior art, the differences between the claimed invention and such prior art, and the level of ordinary skill.

      5.    Whether the alleged invention described and claimed in claim 7 of the '637 patent would have been obvious to a person of ordinary skill in the art in light of the scope and content of the prior art, the differences between the claimed invention and such prior art, and the level of ordinary skill.

      6.    The scope and content of the prior art.

      7.    The difference, if any, between the prior art and the alleged invention.

      8.    The level of ordinary skill in the art at the time of the alleged invention of the '637 patent.

      9.    Whether there is objective evidence of nonobviousness of the subject matter of the '637 patent.

      10.    Whether there is any nexus between any objective evidence of nonobviousness and the claimed invention.

    C.    <u>Indefiniteness</u>

      1.    Whether the patent uses language and terms as precisely as the subject matter of the patent permits.

2.    Whether one skilled in the art would understand the bounds of the claims when read in light of the specification.

D.    Written Description

1.    Whether the written description of the claimed invention set forth in the specification is sufficiently detailed to show persons skilled in the art that Edwin Southern was fully in possession of the claimed invention at the time he filed his patent application.

2.    Whether the claims are broader than the specification.

3.    Whether the claims omit essential elements recited in the specification as part of the invention described by the patent.

E.    Enablement

1.    Whether the specification provides a sufficient disclosure to enable a person skilled in the art to practice the invention without the necessity of first conduct-ing undue experimentation.

2.    Whether the full scope of the claimed invention is enabled.

3.    How many of the embodiments disclosed in the patent are inoperative.

4.    What constitutes undue experimentation.

F.    Best Mode

1.    Whether at the time the patent application was filed, Edwin Southern knew of a mode of practicing the claimed invention that he considered to be superior to others.

-13-

2.    Whether the specification adequately disclosed what Edwin Southern considered to be the best mode for those possessing ordinary skill in the art to practice the claimed invention.

G.    Regards Clause

1.    Whether the claimed invention is within the scope of what Edwin Southern truly regards his invention to be.

2.    Whether Edwin Southern failed to join a colleague as an inventor though the colleagues concepts were in the patent claims.

H.    Joint Inventors Not Named

1.    Whether there are unnamed inventors of the '637 patent who were not given credit for their contributions to the patented subject matter.

2.    Whether Edwin Southern failed to include Uwe Maskos as an inventor though his concepts were included in the patented claims.

3.    Whether Edwin Southern failed to include John Elder as an inventor though his concepts were included in the patent claims.

4.    Whether OGT owns all right, title and interest in the '637 patent.

V.    EQUITABLE DEFENSES

A.    Inequitable Conduct

1.    Whether Edwin Southern committed inequitable conduct in prosecuting the '637 patent.

2.    Whether Edwin Southern violated his duty of candor to the Patent and Trademark Office during prosecution of the '637 patent.

-14-

3.    Whether Edwin Southern withheld art which was material to the patentability of the '637 patent.

4.    Whether Edwin Southern withheld art which would have been important to a reasonable examiner in deciding whether or not to issue the '637 patent.

5.    Whether Edwin Southern made material misrepresentations to the Patent Office during prosecution of the '637 patent.

6.    Whether Edwin Southern withheld art which refuted or was inconsistent with a position that he took in opposing an argument of unpatentablility relied on by the Patent Office or in asserting an argument of patentability.

7.    Whether Edwin Southern failed to report negative test results bearing on the subject matter claimed and described in the '637 patent.

8.    Whether Edwin Southern failed to report Doctoral theses that both reference and refute statements made in the specification and the claims of the '637 patent.

9.    Whether Edwin Southern both misrepresented and concealed the inspiration for his invention.

10.    Whether intent can be inferred from the high degree of materiality of Edwin Southern's misrepresentations and omissions.

11.    Whether Edwin Southern intended to mislead the Patent and Trademark Office into issuing the '637 patent.

12.    Whether the '637 patent is unenforceable due to its procurement through inequitable conduct.

B.    Laches

-15-

    1.      Whether OGT delayed in filing the lawsuit for an unreasonable and inexcusable length of time after it knew of facts supporting its infringement claim.

    2.      Whether Affymetrix suffered harm as a result of that delay.

    3.      Whether OGT's claim is barred by the doctrine of laches.

C.    <u>Misuse</u>

    1.      Whether OGT took improper steps to enhance its market power by entering into an agreement with co-conspirators to limit the number of potential purchasers/licensees of Affymetrix' intellectual property.

    2.      Whether OGT took improper steps to enhance its market power by entering into an agreement with co-conspirators to gain access to Affymetrix' intellectual property at less than competitive rates fixed by OGT and the co-conspirators.

    3.      Whether OGT took improper steps to enhance its market power by entering into an agreement with co-conspirators to interfere with Affymetrix' contractual relations with Beckman Coulter, Inc.

    4.      Whether OGT's patent is unenforceable by virtue of its patent misuse.

    5.      Whether OGT has continued its patent misuse by seeking reasonable royalty damages on products that OGT admits do not infringe the '637 patent.

D.    <u>Affirmative Defense of Unclean Hands</u>.

    1.      Whether OGT's assertion of the '637 patent against Affymetrix is part of an improper plan or scheme among OGT and third parties, who are Affymetrix' competitors and potential competitors, to extract access to Affymetrix' intellectual property on depressed or coerced terms.

2.      Whether OGT, pursuant to the alleged plan, terminated its license negotiations with Affymetrix under the December 18, 1997, Letter of Intent because of the desires of its co-conspirators.

3.      Whether OGT's alleged conspiracy with Hewlett-Packard/Agilent Technologies, Inc. ("Agilent"), Amersham, and others included plans to make a joint litigation attack on Affymetrix.

4.      Whether OGT's claims are barred due to its unclean hands.

E.      Counterclaim for Tortious Interference
        with Contractual Relations.

1.      Whether Affymetrix and Beckman entered into contracts in the form of the Asset Purchase Agreement and Consortium Agreement whereby Affymetrix was and is entitled to obtain license rights under the Isis-Beckman License Agreement.

2.      Whether OGT intentionally interfered with Affymetrix' contractual relations with Beckman by unreasonably refusing to honor Beckman's request for a consortium license for Affymetrix under Clause 9.2 and by unreasonably refusing to recognize the assignment of the license from Beckman to Affymetrix pursuant to Clause 16.2.

3.      Whether Affymetrix suffered a pecuniary loss as a result of OGT's conduct.

F.      Counterclaim for Conspiracy to Tortiously
        Interfere with Contractual Relations.

1.      Whether OGT entered into a plan, scheme, or conspiracy with Hewlett-Packard/Agilent, Amersham, and/or Incyte Pharmaceuticals, Inc. ("Incyte"), one of the objectives of which was to prevent Affymetrix from obtaining license rights to the patents owned by OGT through transactions with Beckman.

-17-

2.     Whether OGT refused to honor Beckman's request for a consortium license for Affymetrix pursuant to Clause 9.2 or refused to recognize Beckman's assignment of the license to Affymetrix pursuant to Clause 16.2 in furtherance of the alleged conspiracy with Hewlett-Packard/Agilent, Amersham, and/or Incyte.

G.     Counterclaim for Unlawful Restraint of Trade
        in Violation of the Sherman Act, Section 1.

1.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to set, fix, establish, decrease, depress, stabilize, or otherwise affect the price or price level(s) for a license or licenses to Affymetrix' intellectual property.

2.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to prevent Affymetrix from obtaining access, through transactions with Beckman, to a license under the patents owned by OGT.

3.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to jointly attack Affymetrix through litigation in order to destroy Affymetrix or reduce the value of its intellectual property.

4.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to boycott Affymetrix and refuse to purchase its intellectual property, except on certain conditions and/or at certain prices or price levels.

-18-

5.    With respect to each combination, contract, agreement, or conspiracy between and among OGT, on the one hand, and Hewlett-Packard/Agilent, Amersham, Incyte, or others, on the other hand, whether such combination, contract, agreement, or conspiracy was itself *per se* illegal.

6.    With respect to each combination, contract, agreement, or conspiracy, whether such combination, contract, agreement, or conspiracy (if not *per se* illegal) had the purpose and effect of unreasonably restraining trade in the relevant markets.

7.    Whether any unlawful combination, contract, agreement, or conspiracy between OGT and others affected or potentially affected interstate or international (foreign) commerce.

8.    Whether Affymetrix suffered injury that was a proximate result of any alleged combination, contract, agreement, or conspiracy, and whether it is likely to continue to suffer injury unless the conduct of the plaintiff/counter-defendant is permanently enjoined.

9.    The amount of damages suffered by Affymetrix as a proximate result of any alleged combination, contract, agreement, or conspiracy.

H.    <u>Counterclaim for Unfair Competition Under Delaware Law.</u>

1.    Whether Affymetrix had a reasonable expectancy of entering into a valid business relationship with Beckman whereby Affymetrix would obtain a license under the patents owned by OGT.

2.    Whether Affymetrix suffered harm as a result of OGT's alleged interference with Affymetrix' business relationship with Beckman.

-19-

I.     Counterclaim for Unfair Competition Under California
       Business and Professions Code Section 17200.

1.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to set, fix, establish, decrease, depress, stabilize, or otherwise affect the price or price level(s) for a license or licenses to Affymetrix' intellectual property.

2.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to prevent Affymetrix from obtaining access, through transactions with Beckman, to a license under the patents owned by OGT.

3.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to jointly attack Affymetrix through litigation in order to destroy Affymetrix or reduce the value of its intellectual property.

4.     Whether OGT combined, contracted, agreed, or conspired with Hewlett-Packard/Agilent, Amersham, Incyte, or others to boycott Affymetrix and not purchase its intellectual property, except on certain conditions and/or at certain prices or price levels.

5.     With respect to reach combination, contract, agreement, or conspiracy between and among OGT, on the one hand, and Hewlett-Packard/Agilent, Amersham, Incyte, or others, on the other hand, whether such combination, contract, agreement, or conspiracy was itself *per se* illegal.

6.    With respect to each combination, contract, agreement, or con-spiracy, whether such combination, contract, agreement, or conspiracy (if not *per se* illegal) had the purpose and effect of unreasonably restraining trade in the relevant markets.

7.    Whether any unlawful combination, contract, agreement, or conspiracy between OGT and others affected or potentially affected interstate or international (foreign) commerce.

8.    Whether Affymetrix suffered injury that was a proximate result of any alleged combination, contract, agreement, or conspiracy, and whether it is likely to continue to suffer injury unless the conduct of the plaintiff/counter-defendant is permanently enjoined.

DOCSSF1:479786.1

-21-

# EXHIBIT   E

## EXHIBIT 10

## OXFORD GENE TECHNOLOGY LTD.'S WITNESS LIST

### I. FACT WITNESSES

OGT states that it may call the following fact witnesses either live, by deposition[1] or by prior testimony. In the event that the Court grants Affymetrix's Second or Third Motions to Amend it Answer and Counterclaims, OGT reserves the right to supplement this witness list to identify additional witnesses that it may call at trial. OGT further reserves the right to call witnesses that are not listed to rebut the testimony of any unanticipated evidence introduced by Affymetrix.

**A.      Fact witnesses that OGT expects it will call at trial.**

OGT expects that it will call the following fact witnesses to testify at trial either live, by deposition or by prior testimony. OGT makes this designation without waiver of the right to call any of the fact witnesses listed on its "may call" list or any witnesses listed in a supplemented witness list or that OGT is otherwise granted leave to call. OGT has further specified those witnesses that it currently expects to call by deposition, but reserves the right to call any of the listed witnesses either live or by deposition.

1.      Affymetrix Inc. (by deposition)
         3380 Central Exwy
         Santa Clara, CA 95051

2.      Robert W. Carroll
         Affymetrix Inc.
         3380 Central Exwy
         Santa Clara, CA 95051

---

[1]OGT reserves the right either to play videotape or read from the transcripts of witnesses to be called to testify by deposition.

3.  Eli Lilly & Co. (by deposition)
    Lilly Corporate Center
    Indianapolis, IN 46285

4.  Stephen P.A. Fodor
    Affymetrix, Inc.
    3380 Central Exwy
    Santa Clara, CA 95051

5.  Edward Hurwitz
    Affymetrix Inc.
    3380 Central Exwy
    Santa Clara, CA 95051

6.  Uwe Maskos
    1 Rue de L'Abbe Gregoire
    Paris, France

7.  Philip Leo McGarrigle
    Affymetrix Inc.
    3380 Central Exwy
    Santa Clara, CA 95051

8.  Vern Norviel
    Affymetrix Inc.
    3380 Central Exwy
    Santa Clara, CA 95051

9.  Kenneth J. Nussbacher
    Affymetrix Inc.
    3380 Central Exwy
    Santa Clara, CA 95051

10. Pfizer Inc. (by deposition)
    235 East 42nd Street
    New York, NY 10017-5755

11. Christopher J. G. Shelley
    Manches & Co.
    3 Worcester Street
    Oxford, OX1 2PZ, England

2

12.    Edwin M. Southern
       Department of Biochemistry
       University of Oxford
        South Parks Road
       Oxford, OXI 30, England
       England


**B.    Fact witnesses that OGT may call at trial.**

    OGT may call the following fact witnesses to testify at trial either live, by

deposition or by prior testimony.  OGT has specified those witnesses that it would expect to call

by deposition or prior testimony if called, and reserves the right to call any of the listed witnesses

either live or by deposition.

1.    Abbott Laboratories (by deposition)
      100 Abbott Park Road
      Abbott Park, IL 60064

2.    Alan P. Blanchard
      6446 NE 153rd Street
      Bothell, WA 98011

3.    Peter J. Coassin
      1301 Trabolt Ranch Road
      Encinitas, CA 92024-4987

4.    John K. Elder
      Department of Biochemistry
      University of Oxford
      South Parks Road
      Oxford, OXI 30, England

5.    Timothy S. Fell
      19 Parker Street
      Oxford, England

6.    Thomas Gingeras
      1541 Crest Drive
      Encinitas, CA 92024

3

7.    Arnold Grant (by deposition or prior testimony)
      Beckman Coulter Inc.
      4300 N. Harbour Blvd
      Fullerton, CA 92834-3100

8.    InCyte Pharmaceuticals (by deposition)
      Thomas Theriault
      CT Corporation System
      818 West Seventh Street
      Los Angeles, CA 90017

9.    Stephen Huxley
      Huxley - Burtram Engineering
      Brookfield Centre
      Cottenham, Cambridge, CB4 8PS
      UK

10.   Martin Johnson
      University of Oxford
       South Parks Road
      Oxford, OXI 30, England

11.   Mitchell A. Kennedy
      Affymetrix Inc.
      3380 Central Exwy
      Santa Clara, CA 95051

12.   Robert Matson (by deposition)
      8324 East Candleberry
      Orange, CA 92869

13..  Joel D. McComb (by deposition or by prior testimony)
      Beckman Coulter Inc.
      4300 N. Harbour Blvd.
      Fullerton, CA 92834-3100

14.   Glenn McGall (by deposition)
      1121 Sladky Avenue
      Mountain View, CA 94040

15. James Osborne (by deposition or by prior testimony)
    Beckman Coulter Inc.
    4300 N. Harbour Blvd.
    Fullerton, CA 92834-3100

16. Ann M.C. Pease (by deposition)
    758 Hauashill Drive
    Sunnyvale, CA 94087

17. Dr. Michael Pirrung
    B120 LSRC
    Duke University
    Durham, NC 27708

18. J. Leighton Read (by deposition)
    1001 Romena Avenue
    Palo Alto, CA 94301

19. Susan E. Siegel
    Affymetrix Inc.
    3380 Central Exwy
    Santa Clara, CA 95051

20. Joseph M. Skerpon (by deposition)
    Banner & Witcoff
    1001 6th Street, 14 W.
    Washington, DC 20001-4597

21. Jay Steffenhagen (by deposition or by prior testimony)
    Beckman Coulter Inc.
    4300 N. Harbour Blvd.
    Fullerton, CA 92834-3100

22. Lubert Stryer (by deposition)
    843 Sonoma Terrace
    Stanford, CA 94305

23. Michael G. Velez
    6549 E. Via Corral
    Anaheim, CA 93807-4310

24.    Antony E. Watson
       Old Rectory, Milden
       Suffolk IP7, 7AF

## II. EXPERT WITNESSES

The following provides an identification of each expert witness that OGT expects

to call to testify at the trial and a statement of the specialities, anticipated testimony and

substance of each opinion the expert will offer at trial.[2]  In the event that the Court grants

Affymetrix's Second or Third Motions to Amend it Answer and Counterclaims, OGT reserves

the right to supplement this expert witness list to identify additional witnesses that it may call at

trial.

A.    Sidney Altman
      71 Blake Road
      Hamden, CT 06517

Dr. Sidney Altman is expected to testify on issues regarding the validity and

enablement of the '637 patent, including rebuttal of opinions set forth in the expert reports of

Affymetrix experts Drs. James Wetmur and Elias James Corey.  Dr. Altman obtained a

bachelor's degree in Physics from the Massachusetts Institute of Technology and received his

doctor philosophy in Biophysics from the University of Colorado.  Since 1971, Dr. Altman has

been employed at Yale University, and has been a full Professor of Molecular, Cellular and

Developmental Biology since 1980.  During the years of 1983-85, Dr. Altman was Chairman of

---

[2]To the extent that Affymetrix experts are permitted to file and rely on any supplemental reports in this case, including but not limited to the report recently served by Dr. Corey with respect to the enablement and enforceability of the Southern patent, OGT's experts may be asked to testify in response to these reports.

6

the Department of Biology, while from 1985-89 he was Dean of Yale College. Dr. Altman has

received many awards for his work in the field of molecular biology, including the Nobel Prize

in Chemistry in 1989 for his work in discovering the catalytic nature of RNA. Dr. Altman's

research has focused on the study of nucleic acid synthesis and hybridization applications.

Dr. Altman is expected to testify in rebuttal to the opinions on the validity of the

'637 patent rendered by Drs. Wetmur and Corey, including an analysis of the state of the prior art

in 1988 and the advances of the Southern patent over that art. In addition, Dr. Altman is

expected to testify regarding the ability of one of ordinary skill in the art to practice the invention

of the Southern patent without undue experimentation. Dr. Altman has submitted a rebuttal

report summarizing these opinions, and he is expected to testify as to all matters reasonably

disclosed in this report.

B.    Michael H. Chase
       Tucker Alan Inc.
       100 West Big Beaver Road, Suite 200
       Troy, MI 48084
       (248) 526-0500

Michael H. Chase will offer expert analysis and opinions on damages issues in

this case. He received a B.S. in Accounting from Indiana University, graduating with highest

distinction. He is a Certified Public Accountant and a Certified Valuation Analyst. Mr. Chase is

a Vice-President at Tucker Alan Inc. He has extensive experience providing business and

management consulting services, and advising clients on intellectual property matters, including

the valuation of businesses and intellectual property rights.

Mr. Chase has previously submitted an expert report on issues relating to the

damages suffered by OGT as a result of Affymetrix's infringement of the Southern patent, and

will be deposed by Affymetrix. Mr. Chase is expected to testify at trial regarding and explain the opinions set forth and discussed in his expert report and in his deposition, and in rebuttal to any testimony introduced by Affymetrix on damages issues, and to explain the damages that Affymetrix should pay to compensate OGT for Affymetrix's infringement, and the prejudgment interest due thereon.

      C.     James E. Dahlberg, Ph.D
                Biomolecular Chemistry, UW Med.
                551 Bardeen, 1300 University Ave.
                Madison, WI 53706-1532
                (608)262-1459 or 262-1359

Dr. Dahlberg will offer expert analysis and opinions on both infringement and validity issues in this case. He is the Frederick Sanger Professor of Biomolecular Chemistry at the University of Wisconsin, Madison, School of Medicine. He is a member of the National Academy of Sciences, the American Academy of Arts and Sciences and is a Foreign Associate of the European Molecular Biology Organization. He has published about 125 scientific research articles and is a co-inventor of twelve United States and five foreign issued patents. He has extensive experience in function and sequence analysis of nucleic acids. He has taught courses in nucleic acid structure and function, cell biology, molecular biology, protein chemistry and intermediary metabolism.

Dr. Dahlberg has submitted two expert reports on issues relating to Affymetrix's infringement of the '637 patent and on issues relating to the validity of the '637 patent. He will be deposed by Affymetrix. Dr. Dahlberg is expected to testify at trial regarding and explain the opinions set forth and discussed in his expert reports and in his deposition, and in rebuttal to any testimony or evidence introduced by Affymetrix on validity issues.

8

D.     Harry F. Manbeck
       1460 Mayhurst Blvd.
       McLean, VA 22102

Harry F. Manbeck, Jr. will offer expert analysis and opinions regarding the issues of willful infringement, patent office practices and procedures, and any inequitable conduct allegations asserted by Affymetrix. Mr. Manbeck graduated with Highest Honors from Lehigh University in 1949 with a B.S. in Electrical Engineering, and received his L.L.B. with Honors from the University of Louisville in 1954. From 1990-92, Mr. Manbeck was Assistant Secretary of Commerce and Commissioner of Patents and Trademarks of the United States. Prior to his government service, Mr. Manbeck practiced law for over thirty-five years, the last twenty of which he served as General Patent Counsel of the General Electric Company. Mr. Manbeck has extensive experience in the practices and procedures of the Patent and Trademark Office, as well as with issues relating to willful infringement and inequitable conduct, and he has been qualified as an expert to testify on these matters in numerous cases.

Mr. Manbeck has submitted two expert reports in this case: (1) on issues relating to Affymetrix's willful infringement of the Southern patent; and (2) in rebuttal to the opinions of Mr. Martin Adelman. Mr. Manbeck is expected to testify at trial regarding the opinions set forth in his expert report relating to willful infringement, including an analysis of Affymetrix's conduct, in light of Mr. Manbeck's vast experience in seeking and obtaining the advice of counsel with respect to patent infringement. Mr. Manbeck will also rebut the opinions of Mr. Adelman on the issues of proper claim interpretation and inequitable conduct, to the extent these issues are part of the trial.

9

5.    David B. Wallace, P.E., Ph.D.
V.P. Technology Development
MicroFab Technologies, Inc.
1104 Summit Ave., Suite 110
Plano, TX 75074
(972) 578-8076

Dr. Wallace will offer expert analysis and opinions on enablement issues in this case. He received a Bachelor of Science degree in Engineering and a Master of Science degree in Mechanical Engineering from Southern Methodist University, and a Ph.D. in Aerospace Engineering from the University of Texas at Arlington. He has extensive experience in the design, fabrication, and operation of ink-jet printheads and printing systems, including both conventional printing (ink on paper and industrial printing onto containers and cartons) and other uses of ink-jet technology, including electronics manufacturing, photonics manufacturing, and biomedical applications. Dr. Wallace is a named inventor on 23 issued U.S. patents, all relating to ink-jet methods and apparatuses.

Dr. Wallace has submitted an expert report on issues relating to the enablement of the '637 patent, in particular with respect to the use of ink jet printing techniques to manufacture oligonucleotide arrays, and will be deposed by Affymetrix. Dr. Wallace is expected to testify at trial regarding and explain the opinions set forth and discussed in his expert report and in his deposition, and in rebuttal to any testimony or evidence introduced by Affymetrix on enablement issues.

6.    Dr. Jeffrey D. Winkler
University of Pennsylvania
231 South 34th Street
Philadelphia, PA 19104

Dr. Winkler will offer expert analysis and opinions regarding validity issues in this case. He received a Bachelor of Science degree in Chemistry from Harvard in 1977 and a Ph.D. in Organic Chemistry from Columbia University in 1981. He continued at Columbia and completed studies there as an American Cancer Society post-doctoral fellow in Bio-Organic Chemistry in 1983. Since then, he has served as an Assistant Professor in the Department of Chemistry at the University of Chicago and is now a tenured Professor that the University of Pennsylvania Department of Chemistry.

Dr. Winkler has submitted an expert report on issues relating to the validity of the '637 patent, in particular with respect to Affymetrix's claim that it invented oligonucleotide arrays before Professor Southern, and has been deposed by Affymetrix. Dr. Winkler is expected to testify at trial regarding and explain the opinions set forth and discussed in his expert report and in his deposition, and in rebuttal to any testimony or evidence introduced by Affymetrix on such issues.

11

# EXHIBIT   F

Westlaw.

1988 WL 70013                                                                     Page 1
Not Reported in F.Supp., 1988 WL 70013 (D.Del.)
**(Cite as: 1988 WL 70013 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
SCRIPPS CLINIC AND RESEARCH
FOUNDATION, and Rorer Group, Inc., Plaintiffs,
v.
BAXTER TRAVENOL LABORATORIES, INC.,
and Travenol Laboratories, Inc.,
Defendants.
**CIV.A. No. 87-140-CMW.**

June 21, 1988.
Gregory A. Inskip, Potter, Anderson & Corroon
Wilmington, Delaware. (Eugene Moroz, Esquire,
Kurt E. Richter, Esquire and William S. Feiler,
Morgan & Finnegan, New York City, of counsel), for
plaintiffs.

Allen M. Terrell, Jr., Richards, Layton & Finger
Wilmington, (Granger Cook, Jr., Esquire and Dean
A. Monco, Cook, Wetzel & Egan, Ltd., Chicago, Ill.,
and Paul C. Flattery, and Robert E. Hartenberger,
Baxter Travenol Laboratories, Inc., Deerfield, Ill., of
counsel), for defendants.

*OPINION*

CALEB M. WRIGHT, Senior District Judge.

**\*1** This discovery dispute arises out of a patent
infringement suit brought by Scripps Clinic and
Research Foundation and Rorer Group, Inc.
("Scripps") against Baxter Travenol, Inc., and
Travenol Laboratories, Inc. ("Baxter"). The dispute
centers on alleged deficiencies in the discovery
responses of both parties during an exchange of
responses on February 6, 1988. Baxter filed a
motion under Federal Rule of Civil Procedure 37 to
compel supplemental responses to its interrogatories
and requests for documents, and to compel the
production of certain deposition transcripts and
exhibits generated in other ongoing patent
infringement suits filed by Scripps to enforce the
patent at issue. Scripps then filed a motion to
compel Baxter to index more than 45,000 documents
which Baxter had produced in response to Scripps'

document requests.

1. *Baxter's Motion to Compel Supplemental
Responses to Its Interrogatories*

Baxter moves the Court to compel Scripps to
supplement its responses to interrogatories numbers
1-2, 4-5, 11-12, 22-23, 27-29, 37-39, 46, 48-49, and
51-52. Scripps declined to offer any specific answer
to any of these interrogatories and instead stated in
each case some form of the statement, "Without
waiving any objection plaintiffs will produce
documents pursuant to Fed.R.Civ.P. 33(c) in lieu of
identification." *See, e.g.* Plaintiffs' Response to
Interr. No. 2.

In support of its answers, Scripps relies on Federal
Rule of Civil Procedure 33(c), which gives a
responding party the option of producing business
records in answer to an interrogatory. Specifically,
Rule 33(c) states:

Where the answer to an interrogatory may be derived
or ascertained from the business records of the party
... and the burden of ascertaining the answer is
substantially the same for the party serving the
interrogatory as for the party served, it is a sufficient
answer to such interrogatory to *specify the records
from which the answer may be derived or
ascertained.... A specification shall be in sufficient
detail to permit the interrogating party to locate and
to identify, as readily as can the party served, the
records* from which the answer may be obtained.

(emphasis added). Scripps' responses are
insufficient under this rule because they contain no
specification of records at all.

Scripps produced approximately 6,700 documents in
response to Baxter's requests. In the interrogatory
answers at issue, Scripps offered no specific answers
to the disputed questions; rather, it just referred to
the boxes of documents. Referring to 6,700
documents does not constitute "specify[ing] the
records," and is insufficient to allow Baxter "to locate
and to identify, as readily as can [Scripps[, the
records from which the answer may be obtained."
Fed.R.Civ.P. 33(c). Scripps clearly did not meet its
"duty to specify" the records. Fed.R.Civ.P. 33(c)
advisory committee's note. It did not even
affirmatively state that the answers to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 70013                                                                                    Page 2
Not Reported in F.Supp., 1988 WL 70013 (D.Del.)
**(Cite as: 1988 WL 70013 (D.Del.))**

interrogatories could be found in the documents. As the Advisory Committee to the Federal Rules has noted: "respond[ing] by directing the interrogating party to a mass of business records ... [is an] abuse of the option." *Id.* As such, Scripps' answers are clearly insufficient and must be supplemented.

In addition, the Court notes that Scripps attempted to use its ability to answer the interrogatories as a bargaining chip in its attempts to convince Baxter to index the document production that is the subject of Scripps' Motion to Compel. In correspondence between counsel, Scripps stated, "Plaintiffs are in the process of completing a list indicating which production documents are responsive to Baxter's various document requests and stand ready to exchange our list with Baxter should Baxter reconsider its position." Letter to Baxter counsel, Feb. 18, 1988. Discovery is not a game in which one party's answers are balanced against the other party's answers. There are rules that govern discovery. Rule 33(c) allows parties to opt to produce business records to aid in answering the interrogatories, not to avoid answering them. Scripps must specify the documents that contain the answers to the interrogatories irrespective of Baxter's behavior. Finally, since it appears from this correspondence that some sort of index exists, it should be produced. L.R. 4.1C.

**\*2** Baxter also moves the Court to compel Scripps to answer interrogatories 51 and 52, in which Baxter seeks the names of everyone who was consulted in order to answer the interrogatories, as well as everyone who had control or custody of any documents produced in response to the interrogatories. Scripps objects to these interrogatories as being unduly broad and burdensome, and as seeking irrelevant information. The Court will grant Baxter's motion to compel responses to these interrogatories. Rule 26(b) specifies as discoverable subject matter "the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Baxter's requests fall squarely within the scope of this Rule and must be answered by Scripps.

Baxter also moves the Court to compel responses to interrogatories numbers 3(c), 3(d), 8-10, 16-18(b), 20, 25-26, and 42-44. Scripps objected to these interrogatories on various grounds, including their being unduly broad and burdensome and not calculated to lead to admissible evidence. Because

the parties did not address these issues in their briefs, however, the Court is without sufficient knowledge to rule on the propriety of the interrogatories. Consequently, the Court will deny Baxter's motion without prejudice with respect to those interrogatories.

**II.  *Baxter's Motion to Compel Supplemental Responses to Its Document Requests***

Baxter seeks to compel Scripps to supplement its answers to document request numbers 1, 4, 7, 14, 17-18, 20-21, 23, 37-38, 45, 47-49, 51, 54-55, 58, 60, and 64-66. The only grounds addressed in the briefs was that Scripps "artificically" limited many of its responses to documents produced on or before December 14, 1981, the date of application of the original patent.

Rule 26(b) limits the scope of document discovery to documents that are relevant to a claim or defense or that appear "reasonably calculated to lead to the discovery of admissible evidence." Scripps limited its responses to document requests numbers 4, 7, 14, 38, 45, 48-49, 54, and 60 to documents generated before December 14, 1981, claiming that documents created after that date are irrelevant. Scripps also limited its response to request number 20 to documents created prior to October 22, 1985, the date of application for the reissue patent. These limitations are improper because Baxter has asserted many defenses concerning the validity of the patent, including inequitable conduct, that may be influenced by events which occurred after the date of application. Therefore, Scripps' responses to these requests are insufficient and must be supplemented. Baxter also objected to Scripps' limiting its responses to requests numbers 21 and 23 to documents created before October 14, 1981. Baxter limited its requests to that time frame, however, and thus Scripps correctly limited its response.

Baxter also moves the Court to compel further responses to document requests numbers 1, 17-18, 37, 47, 51, 55, 58, and 64-66. Request number 1 covers the documents necessary to answer Baxter's interrogatories. Because the procedures for producing documents under Rule 33(c) and Rule 34 are the same under Local Rule 4.1C, all documents will be produced under the interrogatories in the same fashion as they would be under the document request, thus making this document request not necessary. Because the parties did not specifically address the remaining disputed requests in their briefs, the Court is without sufficient knowledge to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rule on their propriety, and will consequently deny Baxter's motion without prejudice with respect to those requests.

### III. *Baxter's Motion to Compel the Production of Deposition Transcripts and Exhibits From Other Suits*

**\*3** In 1983, Scripps filed several other patent infringement suits in the Northern District of California against Genentech, Inc., Chiron Corp., and Miles Laboratories, Inc. Baxter seeks to obtain the transcripts of and exhibits produced during the deposition of certain Scripps employees and other witnesses. Scripps objects to the production of these documents on several grounds, all of which are insufficient.

Scripps first alleges that because Baxter refused to cooperate in coordinating discovery with the other defendants it should not be permitted to now obtain the fruits of such discovery. Baxter correctly points out that the instant suit was filed more than three years after the California suits, and consequently has a much different procedural posture than the other suits. Furthermore, pretrial rulings in the other suits altered the scope of discovery in those actions. These different circumstances indicate that Baxter did not engage in bad faith by refusing to coordinate its discovery and that its action should not influence the requested production.

Scripps next argues that if Baxter is permitted to discover the transcripts and exhibits, it should not be permitted to redepose the same witnesses because Rule 26 prohibits cumulative, duplicative, and burdensome depositions. Baxter has a right to take the depositions itself in order to develop its case properly. Possessing prior transcripts may actually enable Baxter to shorten the depositions by addressing only more important areas. Thus, because the depositions will be taken by a new party, Rule 26 does not prevent their being taken.

Scripps further argues that many documents fall under protective orders entered in the other actions. This would be a serious problem had not Baxter agreed to limit its discovery to depositions of certain Scripps' witnesses, such as Dr. Zimmerman, the inventor of the patented process. Thus, Baxter will not be exposed to any confidential information concerning the defendants in the other suits.

Scripps' final point concerns the time and effort expended by counsel for Scripps and the other

defendants in taking the depositions. The Court agrees that Baxter should not be a "free rider," benefiting from the past work done by the other parties. Therefore, the Court will grant Baxter's motion to compel but will order that Baxter shall pay for the transcripts and exhibits at a rate greater than that for the normal production of documents. The Court will be available for consultation if the parties cannot work out an agreement.

### IV. *Scripps' Motion to Compel Baxter to Index its Responses*

Baxter produced more than 45,000 documents in response to Scripps' document requests. The documents originated in two facilities and were gathered from several departments. Affidavit of Michael J. Griffith. All responsive non-privileged documents were produced, with the exception of marketing and research documents pertaining to plasma-derived Factor VIII:C and recombinant DNA-produced Factor VIII:C. Baxter claims to have produced the documents " as they are kept in the usual course of business." Fed.R.Civ.P. 34(b).

**\*4** Scripps seeks to compel Baxter to index the documents. It claims that although the documents were arranged in bundles within each of the 15 boxes, most of the bundles contained no designation as to the origin of the file, the name of the file, or whether the bundle contained documents from multiple files. It also alleges that the subject matter of documents in any one bundle was often varied. As such, Scripps contends that the files were not presented in a way that would allow it to make a reasonable use of them, and that they were not produced as actually kept in the ordinary course of business. Scripps requests the Court to order Baxter to provide an index between the documents and individual files, the title of each file, and the custodial source of each file.

Rule 34(b) gives Baxter the option of either producing documents as they are ordinarily kept or of organizing and labeling them to correspond to the request. It is obvious that Baxter did not organize the documents to correspond to the individual requests. Baxter also failed, however, to produce the documents as they were kept in the ordinary course of business. The documents were gathered from many people and transferred to Scripps in an unintelligible manner. This is insufficient under Rule 34(b), which has the same requirements of organization in producing documents as does Rule 33(c). Fed.R.Civ.P. 34(b) advisory committee's note;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 70013                                                                        Page 4
Not Reported in F.Supp., 1988 WL 70013 (D.Del.)
**(Cite as: 1988 WL 70013 (D.Del.))**

L.R. 4.1C. Therefore, Scripps' motion is granted.

 An Order will issue in accordance with this Opinion.

 Not Reported in F.Supp., 1988 WL 70013 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

- 1:87cv00140 _____(Docket)
(Mar. 20, 1987)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.