# EXHIBIT   Z

EXHIBIT

45

Exhibit M4
Opposition by Protogene Laboratories, Inc.
to EP 0 619 321
Affymax Technologies N.V.
Our Ref.: D2356 EP/OPP

DECLARATION OF DR. SOLAS

I hereby certify that this correspondence is being deposited with
the United States Postal Service as prepaid first class mail in
an envelope addressed to: Honorable Commissioner of Patents and
Trademarks, Box Interference, Washington, D.C. 20231 on
May 28, 1999.

TOWNSEND and TOWNSEND and CREW LLP

By: _Steven W. Parmelee_

Paper No. ____

**Filed on behalf of:** *SENIOR PARTY FODOR*

By:   Edward J. Keeling, Esq.
      Steven W. Parmelee, Esq.
      Townsend and Townsend and Crew LLP
      Two Embarcadero Center, 8th Floor
      San Francisco, California  94111-3834

      Tel No.:  (415) 576-0200                    BOX INTERFERENCE
      Fax No.:  (415) 576-0300


UNITED STATES PATENT AND TRADEMARK OFFICE

------------------

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Richard Torczon)

------------------

PATRICK O. BROWN and TIDHAR D. SHALON,
Junior Party,

v.

STEPHEN P. A. FODOR, LUBERT STRYER,
J. LEIGHTON READ and MICHAEL C. PIRRUNG,
Senior Party,

------------------

Patent Interference No. 104,359

------------------

_DECLARATION OF DENNIS W. SOLAS_


Fodor EXHIBIT 2014
Brown v. Fodor
Interference 104,359

DECLARATION OF DR. SOLAS

I, Dennis W. Solas, state as follows:

1.    I am presently employed as a Senior Scientist at Affymax. I earned a Ph.D. in Organic Chemistry from Purdue University in 1982. I am the author or co-author of twelve scientific papers and am a named inventor on eight issued patents.  I shared the 1991 American Association for the Advancement of Science Newcomb Cleveland Prize with Steve Fodor and the other scientists who contributed to the creation of the Very Large Scale Immobilized Polymer Synthesis technology.  I am extremely familiar with the organic chemistry techniques and processes that are described in the '305 patent. Additionally, I am well versed on nucleic acid synthesis as it pertains to organic chemistry in the '305 patent.

2.    I have read the declaration of Dr. Larry J. Kricka (Exhibit 2001) submitted to the U.S. Patent and Trademark Office in regard to the T.D. Shalon et al. Patent application No. 08/688,488. In addition I have re-read the '305 patent.

3.    In particular, I have reviewed ¶ 16 of Dr. Kricka's declaration, in which he states that "Pirrung with others has recently indicated that [the technology of the '305 patent], without more, will not allow the synthesis of arrays of polynucleotides of sufficient purity and fidelity to provide a useful article within the claims of the '305 patent.  As elaborated on below, I disagree with Dr. Kricka=s conclusion and also believe it to be directly contradicted in Pirrung's own publications.

4.    The details disclosed in the '305 patent are more than adequate to enable one of ordinary skill in the art, as that person is defined by Dr. Kricka in ¶ 2 of his declaration (Exhibit 2001), to

No. 104,359          -1-

AVI 107124

DECLARATION OF DR. SOLAS

prepare an array using photolithographic methods, including the build-up of polynucleotides of at least four nucleotides in length on the array monomer by monomer. With respect to the chemistry of the process, three basic components are required: 1) A linker, attached at one end to the surface of a substrate and available at a second end for the addition of a monomer (see, for example, col. 8, l. 32-35 and l. 50-51, and col. 19, l. 10-17 of the '305 patent); 2) the use of a photoremoveable group on the second end of each monomer added to the growing end of the polymer chain (see, for example, col. 19, l. 43 through col. 29, l. 53); and 3) the use of blocking groups attached to the exocyclic amines of certain nucleosides (see, for example, col. 32, l. 22 - 24) of the polymer chain. The latter groups are added to protect the exocyclic amines of the cytidine, guanidine and adenosine from damage during the phosphoramidite chemistry which is used to add monomer residues to the growing polymer chain, and they are removed once the polymer synthesis is complete. (Gait, Exhibit 2019, at Chs. 1 and 2). The bonds between the surface, the linker and the first nucleoside must be sufficiently strong to withstand the conditions required to remove the blocking groups from the exocyclic amines of the nucleic acid. These basic components mirror the steps required for phosphoramidite-based DNA synthesis (or DMTr synthesis) - which was a commercial product well before December 1990 (Caruthers, Science 230:218 (1985), Exhibit 2018) - except that the conventional protecting group of DMT synthesis is replaced by a photoremoveable group. Even Dr. Pirrung recognized this aspect of this process:

Conventional solid-phase DNA synthesis has been essentially perfected (to the level of automation) through development of the phosphoramidite coupling method using DMTr protection of the 5' hydroxyl of nucleoside monomers. Adaptation of any solid-

No. 104,359            -2-

AVI 107125

DECLARATION OF DR. SOLAS

phase synthesis method to light-directed synthesis requires only
the replacement of a conventional protecting group with a light-
sensitive group.

Pirrung, et al., J. Org. Chem. 60:6271 (1995) (Exhibit 2015).

5.    Examples of each of the three basic components are
provided in the '305 patent as indicated above in paragraph 4.
Moreover, one of ordinary skill in the art would also know of
additional exocyclic amine blocking groups for adenine, guanidine and
cytidine in the late 80s. (See, for example, Gait which was
incorporated by reference for all purposes into the '305 patent,
Exhibit 2019, chs. 1,2, and which would be known to one of ordinary
skill in the art in the late 1980s). Thus, the '305 patent fully
teaches one of ordinary skill in the art the chemical components and
methods needed to construct an array using photolithographic methods.
The teachings regarding each of the foregoing components is explained
in greater detail immediately below.

### Substrate to Probe Linker Molecules

6.    The '305 specification discloses that linker molecules may
be, "for example, aryl, acetylene, ethylene glycol oligomers
containing from 2-10 monomers, diamines, diacids, amino acids, or
combinations thereof." (col.8, l. 32-35, of the '305 patent). The
ethylene glycol oligomer example, in particular, could link a
nucleoside or polynucleotide to a substrate in a manner such that the
linker-to-probe bond would not cleave upon treating the array, i.e.,
with ammonia, to remove blocking groups on the exocyclic amines of
the individual bases, or deoxyribonucleosides, in the probe.

No. 104,359                -3-

DECLARATION OF DR. SOLAS

7.    The chemistry to synthesize DNA probes on a glass substrate was based on basic chemistry techniques well known to a Ph.D. skilled in the art in 1989. (See, for example, Gait, Exhibit 2019, chs. 1 and 2). Briefly, the process commenced with the attachment of a linker molecule to the substrate via reaction with hydroxyl groups present on the surface of the substrate. Next the linker molecules are modified by the addition of a first protected phosphoramidite nucleoside. The phosphoramidite nucleoside reacts with the hydroxy groups on the linker forming a phosphite bond. Next the phosphite bond is oxidized to create a phosphate bond. This bond gives the probes attached to the array the stability to avoid cleavage during the remainder of the synthesis of the probes and the removal of blocking groups on the exocyclic amines on the adenine, guanidine, and cytidine bases of the probes.

8.    The '305 patent and the applications incorporated by reference provide for linker-to-probe bonds which are known to be highly resistant to cleavage when exposed to ammonia, i.e., amide, ether, alkyl and amine bonds. It was also well known that exposure to ammonia would remove certain exocyclic amine blocking groups. (See, for example, Gait, Exhibit 2019). While the addition of heat, increasing the time for exposure to the ammonia solution, exposure to concentrated ammonia solution, or any combination of these procedures, could in some cases cause the detachment of some or all of the probes on an array, the use of milder ammonia exposure conditions, which would prevent cleavage of the linker bond during DNA solid phase synthesis was well known in the art in the late 1980s. (See, for example Gait, Exhibit 2019, ch. 2 and Schulhof, Fodor, Exhibit 2020). Thus, a non-cleavable linker, suitable for use with nucleic acids and capable of attachment to protected

No. 104,359        -4-

AVI 107127

DECLARATION OF DR. SOLAS

phosphoramidite nucleosides using methods known in the art as of the late 1980s, was disclosed in the '305 patent.

### Exocyclic Amine Blocking Groups

9.   Blocking groups are organic molecules designed to protect the exocyclic amines of the individual bases of DNA from forming chemical bonds with other molecules, including their complementary bases. During DNA synthesis, blocking groups are required for adenosine, guanine and cytidine. (See, for example, Gait, Exhibit 2019). Thymidine does not require a blocking group because it does not have an exocyclic amine. In ¶ 17 of his declaration (Exhibit 2001), Dr. Kricka states that the use of nucleotide base protecting groups "is nowhere described in the '305 patent". However, one of ordinary skill in the art in 1989 would certainly have known to use nucleotide base protecting groups to protect the exocyclic amines of adenosine, guanidine and cytidine, as the application of phosphoramidite chemistry to DNA synthesis (which requires the use of such groups) was exceedingly well-known by the late 1980s, and in fact was already commercially available. (See, Caruthers, Exhibit 2018). Moreover, I note the standard reference for the application of this technique, "Oligonucleotide Synthesis: A Practical Approach", by Gait, published in 1984, was incorporated by reference into the '305 patent for all purposes and additionally would have been known to one of ordinary skill in the art in the late 1980s. See col. 27, l. 47-50, of the '305 patent.

10.   With respect to which exocyclic amine blocking groups to use, one of ordinary skill in the art in 1989 would have known of the publication of a paper by Schulhof et al., in early 1987 (Exhibit 2020), describing the use of phenoxyacetyl, methoxyacetyl and other

No. 104,359            -5-

DECLARATION OF DR. SOLAS

blocking groups for adenosine and guanidine and of isobutryl for cytosine. This paper was published in Nucleic Acids Research, a standard reference for one of ordinary skill in the art. Indeed, Pirrung includes this paper as a reference in his 1998 paper (Exhibit 2015) discussing the use of exocyclic amine blocking groups. The Schulhof paper specifically highlights the ease with which phenoxyacetyl groups could be removed from adenine and guanidine, and with which isobutryl could be removed from cytidine, at the end of the synthesis process. Therefore, one of ordinary skill in the art would have known of suitable exocyclic amine blocking groups for adenine, guanidine and cytidine by at least the late 1980s.

11.  Dr. Kricka has included in his declaration a long passage from Dr. Pirrung discussing possible difficulties associated with the use of benzoyl as a protecting group for cytidine. (Kricka, ¶ 16). This discussion, however, is irrelevant to the teaching of the '305 patent, as one of ordinary skill in the art would not necessarily be directed towards benzoyl as other protecting groups for cytosine were well known including the isobutryl group. In fact, following the teaching of the Schulhof paper (Fodor Exhibit 2020), one of ordinary skill in the art would be directed to the use of isobutyrl as the Scholhof paper demonstrates that isobutyrl can be removed from the exocyclic amine of cytidine in 30 minutes, whereas, using identical conditions, removal of benzoyl requires two hours (or four times as long).

### 5'-Photoprotecting Groups

12.  Both NV (nitroveratryl) and NVOC (nitroveratryl oxycarbonyl) can be used to photoprotect nucleic acids and both protecting groups are disclosed in the '305 patent. See, for

No. 104,359              -6-

AVI 107123

DECLARATION OF DR. SOLAS

example, col. 6, l. 46; col. 21 l. 1-30; col. 28, l. 14 and col. 32, l. 16-18 of the '305 patent). Use of 5'nitroveratryl thymidine attached through the 3' hydroxyl group and deprotection by illumination to reveal reactive hydroxyl groups is also disclosed in the '305 patent.

### Coupling Efficiency

13.   In ¶ 6 of Dr. Kricka's declaration, reference is also made to the Pirrung 1995 paper, addressing empirically obtained synthesis yields using the photolithographic process. However, Dr. Kricka fails to point out that these observations were made performing the photolithographic process *on a beaded surface*. (Exhibit 2015, p. 6273, col. 1, l. 32-33.) No consideration is made, for example, for results which could be due to a failure to fully expose all sides of the beaded surface. One analogy to explain the possible shortcoming of this approach, for example, would be to compare sun exposure on the bright side of the moon to that of the dark side of the moon. Even Dr. Pirrung recognizes that the results he obtained from his bead experiments might not be directly applicable to those obtained from a flat surface. He states (and Dr. Kricka quotes without comment): "If the yield for two couplings observed here (approx. 66%) *is representative of similar reactions on a flat surface, . . . .*" (Emphasis added.) And indeed when using a flat surface for photodeprotection experiments (as reflected in Pirrung's 1998 paper Exhibit 2016 and referred to in the Kricka Declaration), Dr. Pirrung concludes:

> while these results demand improvement in order to maximize the
> fidelity of the in situ synthesized oligonucleotides and
> therefore of nucleic acid hybridization, it is interesting that
> the results of an actual hybridization experiment *show little*

No. 104,359                -7-

05-28-99  14:59  OXFORD MGT DIV DIAG JOB #81 0522    ID=2866238661    P.3  P.17

DECLARATION OF DR. SOLAS

difficulty with discriminating a perfect hybrid from internal one-base mismatches despite the imperfect sequence fidelity that is a consequence of the less-than-quantitative cycle yields. (emphasis added)

J. Org. Chem., at 243. (Exhibit 2016). (Emphasis added.)

14.    Conventional phosphoramidite chemistry could also be used on an array which has attached linkers terminating in free hydroxyl groups.  Using this approach, one of ordinary skill in the art could prepare an array with DNA polymers attached at the approximately the same density as the starting linkers.

15.    The disclosures of the '305 patent, then, are fully adequate to enable one of ordinary skill in the art as of 1989 to use the chemistry needed to prepare an array that satisfies the Claims of the '305 patent, in particular Claims 1 and 15.

I further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that I make these statements with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize validity of the patent.

DATE: 5/28/99

Dennis W. Solas

No. 104,359                -8-

AVI 107131

# EXHIBIT   AA

# KIRKLAND & ELLIS LLP

**AND AFFILIATED PARTNERSHIPS**

200 East Randolph Drive
Chicago, Illinois 60601

Paul Collier
(312) 861-2471
pcollier@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200

May 25, 2006

**VIA ELECTRONIC MAIL**

Andrea Gross, Esq.
Affymetrix, Inc.
6550 Vallejo Street
Suite 100
Emeryville, CA 94608

          **Re:**   *Affymetrix, Inc. v. Illumina, Inc.*, Civil Action No. 04-901 JJF

Dear Andrea:

      I write in response to your letter dated May 24, 2006.

      With respect to licensing files, we disagree with your contention that the parties agreed to exchange licensing materials shortly before expert reports were due. Further, we dispute your contention that Illumina is not entitled to any further deposition time with a Rule 30(b)(6) witness relating to licensing issues. As an initial matter, Affymetrix produced numerous licenses after it produced Mr. Sherr for deposition as its Rule 30(b)(6) witness for several licensing-related topics, and therefore Illumina did not have the opportunity to depose Mr. Sherr regarding these licenses. To the extent that Affymetrix intends to rely on these belatedly-produced licenses, we request that Affymetrix provide Illumina the opportunity to depose a Rule 30(b)(6) witness regarding them. Furthermore, because Affymetrix has yet to produce all the licensing material relating to each license on which it intends to rely, Illumina once more requests the opportunity to depose a Rule 30(b)(6) witness regarding these materials. Nonetheless, we understand that it is Affymetrix's position that it will not produce any further licensing material until shortly before expert reports and will not provide Illumina any further deposition time with a Rule 30(b)(6) witness relating to licensing.

      With respect to the manufacturing yield/capacity issue, we have closely reviewed the material that Affymetrix has produced on this issue, and we stand by our contention that this is only a partial production of materials that relate to this issue. Accordingly, we request once more that Affymetrix produce all documents and materials that relate to this issue, including the manufacturing yield/capacity issues that Affymetrix has publicly acknowledged with respect to its 100K and 500K chips. For instance, Affymetrix's production to date contains virtually no internal correspondence relating to these issues. Given the public visibility of these issues, we

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

### KIRKLAND & ELLIS LLP

Andrea Gross, Esq.
May 25, 2006
Page 2

strongly suspect that a substantial body of internal correspondence exists.  Please advise if you have availability on Wednesday, or any other days the remainder of next week, to discuss these licensing and capacity issues further.

Finally, we request that Affymetrix provide dates on which Mr. McCarrigle is available for his outstanding deposition.

Very truly yours,

Paul D. Collier

# EXHIBIT   BB



Andrea Gross
Assistant General Counsel, Litigation
Direct Dial: 510-428-8573
E-Mail Address: Andrea_Gross@affymetrix.com

May 26, 2006

*BY E-MAIL*

Paul Collier, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636

      Re:    Affymetrix, Inc. v. Illumina, Inc.

Dear Paul:

      I write in response to your letter of May 25, 2006.

      With respect to Illumina's recent request that Affymetrix produce its licensing files immediately, please provide an explanation of how Illumina believes it could be prejudiced if Affymetrix produces these materials before its expert report on damages is due. As you know, Affymetrix does not yet know which of its licenses it will rely on at trial. However, we have agreed to produce materials from the files of those licenses on which Affymetrix intends to rely prior to the exchange of expert reports. This means that Illumina will have these materials for approximately 45 days before its rebuttal report is due. This should be more than enough time for Illumina and its expert to review and analyze the materials. We thought that Illumina understood this and agreed with it when you did not respond to our letter of March 3.

      In fact, it is Affymetrix, and not Illumina, that has been prejudiced with respect to discovery in the area of licensing and reasonable royalty rates. Affymetrix has produced all of its licenses to Illumina. Illumina has produced only a carefully-selected handful of its licenses and refused to produce the remainder in spite of our repeated requests for them. Illumina has also prevented Affymetrix from obtaining deposition testimony about these licenses. Lastly, Illumina has produced negotiation documents for only one license, and what was produced is incomplete.

      As to capacity, Affymetrix has produced the documents relevant to this issue, including the internal documents relied on by Affymetrix personnel responsible for overseeing manufacturing capacity. The production includes over 400 pages of documents and 36 live files. We believe that the production is more than adequate, particularly since Illumina has

6550 Vallejo Street, Suite 100
Emeryville, CA 94608
Telephone 510 428 8500
Fax 510 428 8583
www.affymetrix.com

Paul Collier
May 26, 2006
Page 2

taken a 30(b)(6) deposition on this subject and questioned several Affymetrix witnesses including Affymetrix CEO Steve Fodor about it. Illumina has not identified how it is prejudiced by not having even more documents with respect to capacity if in fact, such documents even exist at Affymetrix.

We are willing to meet and confer with you on these subjects. I will be out of the office on vacation from May 30 until June 12. Because I am the most familiar with these issues, I suggest that our discussion wait until my return. However, if you wish to speak with someone sooner, you may contact Dan Reed or Mike Malecek.

We are working on securing a deposition date for Mr. McGarrigle.

Very truly yours,

Andrea Gross
Assistant General Counsel, Litigation

# EXHIBIT CC

Westlaw.

--- F.Supp.2d ----                                                                                      Page 1
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----)**

# H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Ole K. NILSSEN and GEO Foundation, Ltd.,
Plaintiffs,
v.
OSRAM SYLVANIA, INC. and Osram Sylvania
Products, Inc., Defendants.
No. 01 C 3585.

July 5, 2006.

**Background:** Patentee and his foundation brought
action for infringement of several patents relating to
electronic lighting products, and alleged infringers
filed counterclaim, seeking declaration that the
patents were unenforceable because of inequitable
conduct.

**Holdings:** Following bench trial, the District Court,
John W. Darrah, J., held that:

24(1) patentee's failure to disclose his significant
personal, professional, and financial relationship with
declarant when he knowingly submitted declarant's
affidavits to the Patent and Trademark Office (PTO)
was inequitable conduct;

28(2) patentee's multiple false declarations of small
entity status and his improper small entity
maintenance fee payments was inequitable conduct;

29(3) foundation that held patents under an exclusive
license could not properly be classified as a non-for-
profit corporation entitled to pay small entity
maintenance fees;

31(4) patentee's false claims of priority dates was
inequitable conduct;

35(5) patentee's failure to disclose pending patent
litigation when applying for patents that disclosed the
same subject matter was inequitable conduct; and

39(6) patentee's failure to disclose material prior art
references when applying for patents was inequitable
conduct.

Ordered accordingly.

**[1] Patents 291 €──0**

291 Patents
The duty of candor extends throughout the entire
prosecution history of the patent. 37C.F.R. § 1.56(a).

**[2] Patents 291 €──0**

291 Patents
Inequitable conduct occurs when a patentee breaches
his or her duty to the Patent and Trademark Office
(PTO) of candor, good faith, and honesty; this
conduct includes affirmative misrepresentations of
material fact, failure to disclose material information,
or submission of false material information, coupled
with an intent to deceive. 37 C.F.R. § 1.56(a).

**[3] Patents 291 €──0**

291 Patents
Inequitable conduct analysis consists of two steps: (1)
a determination of whether the conduct meets a
threshold level of materiality and intent to mislead
and (2) a weighing of the materiality and intent in
light of all of the circumstances to determine whether
the applicant's conduct is so culpable to render the
patent unenforceable. 37 C.F.R. § 1.56(a).

**[4] Patents 291 €──0**

291 Patents
Predicate facts supporting inequitable conduct
defense in patent case must be proven by clear and
convincing evidence. 37 C.F.R. § 1.56(a).

**[5] Patents 291 €──0**

291 Patents
Finding of inequitable conduct as to a single claim of
a patent renders all claims of that patent
unenforceable, even as to those claims not tainted by
the inequitable conduct. 37 C.F.R. § 1.56(a).

**[6] Patents 291 €──0**

291 Patents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Information not disclosed to the Patent and Trademark Office (PTO) during prosecution of patent is material under the "reasonable examiner" standard if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent, or under the narrower standard set forth in the amended rule defining materiality. 37 C.F.R. § 1.56(b).

**[7] Patents 291 ☞0**

291 Patents
Result of a Patent and Trademark Office (PTO) proceeding assessing patentability in light of information not previously disclosed can be of strong probative value in determining the materiality of the undisclosed information, for purposes of determining whether there was inequitable conduct. 37 C.F.R. § 1.56(a).

**[8] Patents 291 ☞0**

291 Patents
Patent and Trademark Office (PTO) examiner need not rely on a misrepresentation in order for the misrepresentation to be material for purposes of inequitable conduct determination.

**[9] Patents 291 ☞0**

291 Patents
Intent to mislead or deceive the Patent and Trademark Office (PTO) for purposes of inequitable conduct determination may be inferred from clear and convincing evidence of the surrounding circumstances, including the facts and circumstances surrounding the applicant's conduct. 37 C.F.R. § 1.56(a).

**[10] Patents 291 ☞0**

291 Patents
Intent to mislead or deceive the Patent and Trademark Office (PTO) for purposes of inequitable conduct determination cannot be inferred solely from the fact that material was not disclosed; instead, there must be some factual basis for finding intent to mislead or deceive. 37 C.F.R. § 1.56(a).

**[11] Patents 291 ☞0**

291 Patents
When determining intent to mislead or deceive the

Patent and Trademark Office (PTO) for purposes of inequitable conduct claim, the court must weigh all of the evidence, including evidence of good faith. 37 C.F.R. § 1.56(a).

**[12] Patents 291 ☞0**

291 Patents
Breach of the duty of candor early in the prosecution of a patent may render unenforceable all claims which eventually issue from the same or a related application. 37 C.F.R. § 1.56(a).

**[13] Patents 291 ☞0**

291 Patents
A patent that issues from a continuation or divisional application may be held unenforceable where (1) the applicant engaged in inequitable conduct with respect to the prosecution of an earlier related application in the chain leading to the challenged patent and (2) the inequitable conduct relates to the asserted claims of that patent. 37C.F.R. § 1.56(a).

**[14] Patents 291 ☞0**

291 Patents
Mere occurrence of inequitable conduct in connection with an application in a chain of patent applications is not sufficient to invalidate a patent issued as a result of a later application in that chain; instead, the earlier inequitable conduct in the chain must be related to the targeted claims of the ultimately issued patents sought to be enforced. 37 C.F.R. § 1.56(a).

**[15] Patents 291 ☞0**

291 Patents
Generally, mere similarity in subject matter, mere citation to the unenforceable patent, and sharing a parent application are insufficient to invalidate a patent issued from a chain of applications in which inequitable conduct has been found as to an application within that chain. 37 C.F.R. § 1.56(a).

**[16] Patents 291 ☞0**

291 Patents
Inequitable conduct can be cured by a patent applicant by: (1) expressly advising the Patent and Trademark Office (PTO) of the misrepresentation's existence, (2) advising the PTO of what the actual facts are and making it clear that further examination

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

in light thereof may be required if any PTO action has been based on the misrepresentation, and (3) establishing patentability on the basis of the factually accurate record. 37 C.F.R. § 1.56(a).

**[17] Patents 291 🔑0**

291 Patents
Curing inequitable conduct cannot be made through manipulation of the patent prosecution procedures, such as amending or canceling claims or filing continuation and divisional applications. 37 C.F.R. § 1.56(a).

**[18] Patents 291 🔑0**

291 Patents
Doctrine of unclean hands can apply where a plaintiff engages in misconduct related to a patent at issue.

**[19] Patents 291 🔑0**

291 Patents
Under the doctrine of unclean hands, inequitable conduct can render all patent claims having an immediate and necessary relation to that conduct unenforceable as to a single patent or to a series of related patents.

**[20] Patents 291 🔑0**

291 Patents
Patent examiners have broad authority to request information they deem relevant to the issue of patentability.

**[21] Patents 291 🔑0**

291 Patents
A declarant's prior or present relationship with the patent application may be material, and failure to disclose that relationship may constitute inequitable conduct. 37 C.F.R. § 1.56(a).

**[22] Patents 291 🔑0**

291 Patents
A declarant's relationship with the patent applicant is material if: (1) the declarant's views on the underlying issue are material and (2) the relationship to the applicant is significant.

**[23] Patents 291 🔑0**

291 Patents
Generally, affidavits are inherently material, and the affirmative act of submitting an affidavit in support of a patent application must be construed as being intended to be relied upon.

**[24] Patents 291 🔑0**

291 Patents
Patent applicant's failure to disclose his significant personal, professional, and financial relationship with declarant when he knowingly submitted declarant's affidavits in response to the Patent and Trademark Office's (PTO) reexamination of a patent in an attempt to address the examiner's rejection of certain claims and when addressing the PTO's rejection of claims within application for a related patent was inequitable conduct that rendered the patents unenforceable.

**[25] Patents 291 🔑0**

291 Patents
Patent that was unenforceable because of inequitable conduct was not sufficiently related to two other patents to render them unenforceable under the doctrine of infectious unenforceability, although the unenforceable patent was referred to in the description of prior art in the other two other patents and shared a common parent application.

**[26] Patents 291 🔑0**

291 Patents
False declarations of small entity status and improper patent maintenance fee payments may constitute inequitable conduct. 35 U.S.C.A. § 41; 37 C.F.R. § 1.27(a).

**[27] Patents 291 🔑0**

291 Patents
While the Patent and Trademark Office (PTO) is not required to make an inquiry into whether the patentee has established good faith as a condition of accepting a late payment of a maintenance fee, if a patentee seeks to correct an incorrect payment of fees as a small entity without good faith, the patentee may be found to have engaged in inequitable conduct. 37 C.F.R. § 1.28(c).

**[28] Patents 291 🔑0**

291 Patents

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                   Page 4
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Patentee's multiple false declarations of small entity status and his improper small entity maintenance fee payments for several related patents was inequitable conduct that rendered the patents unenforceable; patentee made multiple false declarations and small entity payments over several years, had years of experience prosecuting and maintaining his patents, and claimed that he ceased being informed on the requirements to qualify for small entity fees at a time when the law was changed to his apparent detriment. 35 U.S.C.A. § 41; 37 C.F.R. § 1.28(c).

**[29] Patents 291 ☞0**

291 Patents
Foundation that held patents under an exclusive license could not properly be classified as a non-for-profit corporation entitled to pay small entity patent maintenance fees, where foundation licensed the patents to large entities and did not engage in charitable activities. 35 U.S.C.A. § 41; 37 C.F.R. § 1.28(c).

**[30] Patents 291 ☞0**

291 Patents
False statements regarding an application priority date may constitute inequitable conduct.

**[31] Patents 291 ☞0**

291 Patents
Patentee's false claims of priority dates in various patent applications was inequitable conduct that rendered the patents unenforceable; misclaimed priority dates allowed patentee to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. 35 U.S.C.A. § 120.

**[32] Patents 291 ☞0**

291 Patents
Failure to disclose related litigation during patent application process may constitute inequitable conduct. MPEP § 2001.06(c).

**[33] Patents 291 ☞0**

291 Patents
Related litigation is per se material information covered by the duty of disclosure during patent application process; close cases should be resolved by disclosure, not unilaterally by applicant.

**[34] Patents 291 ☞0**

291 Patents
Ongoing litigation is material to patent application if the patent involved in the litigation shares the same specification and discloses the same subject matter as the pending patent.; materiality of ongoing litigation is obvious if it challenged the validity and enforceability of the subject matter of the pending application.

**[35] Patents 291 ☞0**

291 Patents
Patentee's failure to disclose pending patent litigation when applying for patents that disclosed the same subject matter as the patents he asserted in that litigation was inequitable conduct that rendered the patents that issued as a result of the application unenforceable, where patentee intended to mislead the Patent and Trademark Office (PTO) by failing to disclose the ongoing litigation and did not do so in good faith. MPEP § 2001.06(c).

**[36] Patents 291 ☞0**

291 Patents
Inequitable conduct can arise from the failure to disclose prior art in patent application.

**[37] Patents 291 ☞0**

291 Patents
To prevail on a charge of inequitable conduct for failure to disclose prior art in a patent application, the defendant must demonstrate materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead.

**[38] Patents 291 ☞0**

291 Patents
Prior art reference may be material even though the claims of a patent application are patentable over that reference.

**[39] Patents 291 ☞0**

291 Patents
Patentee's failure to disclose material prior art references when applying for patents was inequitable conduct that rendered the patents unenforceable.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Page 5

[40] Patents 291 ☞0

291 Patents
Mere similarity in subject matter and sharing a parent application are insufficient to invalidate a patent issued from a chain of applications in which inequitable conduct has been found as to an application within that chain.

Patents 291 ☞328(2)

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases

Patents 291 ☞328(2)

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases

Patents 291 ☞328(2)

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
4,045,711, 4,053,813, 4,251,752, 4,266,134, 4,392,087, 4,461,980. Cited as Prior Art.

4,677,345, 4,857,806, 5,047,690, 5,164,637, 5,189,342, 5,233,270, 5,341,067, 5,343,123, 5,402,043, 5,416,386, 5,432,409, 5,479,074, 5,481,160, 5,510,680, 5,510,681. Unenforceable.

4,819,146, 4,857,806, 5,013,974, 5,164,637, 5,185,560, 5,191,262, 5,214,356, 5,416,386, 5,432,409. Cited.

Aaron A. Barlow, John E. Titus, Jonathan Hill, Raymond N. Nimrod, Stephen M. Geissler, Jenner & Block, LLC, George S. Bosy, Roper & Quigg, Oliver J. Larson, Chicago, IL, Donald F. Parsons, Jr., Morris Nichols Arsht & Tunnell, Wilmington, DE, for Plaintiffs.

Brian Douglas Sieve, Garret A. Leach, Adam James Christoph Gill, Cindy S. Ahn, Jami A. Jarosch, Kalpesh K. Shah, Michael I. Cohen, Michelle Ware Jordan, Nyika Onyesi Strickland, Serena Jean Gondek, Kirkland & Ellis LLP, Arthur Gollwitzer, III, Michael Best & Friedrich LLP, Kevin John O'Shea, Winston & Strawn, Thomas Gerard Pasternak, RR Donnelley, Chicago, IL, David K. S. Cornwell, Sterne, Kessler, Goldstein & Fox, P.L.L.C., Washington, DC, for Defendants.

*AMENDED OPINION AND ORDER*
DARRAH, J.

*1 Plaintiffs, Ole K. Nilssen and the GEO Foundation, Ltd., bring this action against Defendants, Osram Sylvania, Inc. and Osram Sylvania Products, Inc., for the alleged infringement of several patents. Plaintiffs originally alleged that Defendants infringed twenty-six patents. Subsequently, Plaintiffs withdrew infringement allegations for fifteen of the twenty-six patents. The eleven remaining patents in suit are United States Patent Nos. 4,857,806 (the "'806 Patent"); 5,164,637 (the "'637 Patent"); 5,233,270 (the "'270 Patent"); 5,343,123 (the "'123 Patent"); 5,402,043 (the "'043 Patent"); 5,416,386 (the "'386 Patent"); 5,432,409 (the "'409 Patent"); 5,479,074 (the "'074 Patent"); 5,481,160 (the "'160 Patent"); 5,510,680 (the "'680 Patent"); and 5,510,681 (the "'681 Patent").

Defendants answered, denying infringement, and filed a counterclaim for declaratory judgment, alleging that the patents have not been infringed by Defendants and that the patents in suit are unenforceable because Nilssen engaged in five types of inequitable conduct: (1) submitted misleading affidavits to the Patent and Trademark Office ("PTO"); (2) improperly claimed and paid fees as a small entity; (3) improperly claimed priority dates in several patent applications; (4) failed to disclose litigation against Motorola, Inc. during the prosecution of patents in suit that involved the same subject matter as the patents at issue in the Motorola litigation; (5) failed to disclose material prior art references to the PTO during the prosecution of several patent applications; and (6) based on Plaintiffs' inequitable conduct, Plaintiffs' infringement action is barred by the doctrine of unclean hands.

Trial of the inequitable conduct issues was by the Court without a jury. [FN1] During the six-day trial, the parties presented over four hundred exhibits and testimony of seven witnesses, including four expert

--- F.Supp.2d ----                                                    Page 6
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

witnesses. The parties also submitted extensive post-trial written arguments and proposed findings of facts and conclusions of law.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The several claims of inequitable conduct present common questions of law and fact. However, some raise distinct legal and factual issues. Therefore, the Decision section of this Opinion and Order, for purposes of clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, they shall be so deemed.

### FINDINGS OF FACT

#### Nilssen's Background

*2 Nilssen, who resides in Illinois, is a citizen of Norway. Nilssen earned a bachelors degree in electronic engineering from the University of Wisconsin in 1952 and earned a masters degree in electrical engineering from the University of Wisconsin in 1953. Nilssen was employed by Fyrnetics, Inc., at which time he met Dale Fiene. Nilssen has at least 241 U.S. Patents issued in his name. These patents relate, in large part, to electronic lighting products, such as electronic ballasts, track lighting, and compact fluorescent screw-in lamps. Nilssen holds himself out as an expert in the field of electronic ballasts.

Nilssen originally hired registered patent attorneys to draft and prosecute his patent applications. In 1983, Nilssen assumed the prosecution of his pending patent applications and began drafting and prosecuting his patent applications, pro se. Nilssen considers himself an expert in the prosecution of patents and prosecuting his patent applications, pro se, because he believes that he understands the subject matter "far better than any attorney." Nilssen estimates that as a pro se applicant, he has prosecuted over 1,000 patent applications. Nilssen also

prosecuted, pro se, appeals before the Board of Patent Appeals and the Federal Circuit. As a pro se applicant and appellee, Nilssen regularly cites to the Manual of Patent Examining Procedure ("MPEP"), case law, and patent statutes and regulations. Nilssen prosecuted the applications for the twenty-six patents (now eleven) involved in the present lawsuit, pro se. Nilssen is listed on these patents as the sole inventor. With each patent application, Nilssen signed a declaration attesting, under oath, that he understood the duty to disclose material information and that he had complied with this duty. Nilssen is knowledgeable regarding patent law and patent examining procedure.

#### (1) Affidavits Submitted to the PTO

Dale Fiene began working for Nilssen as a technical expert in the late 1980's. Fiene had met Nilssen while they both were employed by Fyrnetics. Fiene and Nilssen share an office in Barrington, Illinois. Fiene owns his own company, International Product Development, or IPD. Since its inception in 1989, Fiene has been the sole officer, shareholder, and employee of IPD. In 1989, Nilssen entered an agreement with Fiene and an agreement with IPD. The agreement with IPD provides that Nilssen would pay IPD $20,000 per quarter for various technical assistance. The agreement between Nilssen and Fiene is a contingency contract in which Nilssen agreed to pay Fiene a percentage of all the licensing revenue and litigation settlements related to Nilssen's patents up to a maximum of $500,000 (adjusted for inflation from 1989). From 1989 through 2001, Nilssen paid Fiene over $1.5 million. Nilssen continues to pay IPD $20,000 per quarter (adjusted for inflation from 1989). In addition, pursuant to a 2001 contract, Fiene receives 20 percent of all royalties Nilssen receives from the Geo Foundation.

#### The '345 Patent

*3 In June 1987, U.S. Patent No. 4,677,345 (the " '345 Patent") was issued to Nilssen.[FN2] Subsequently, Motorola requested that the PTO re-examine the '345 Patent. Motorola's request was granted in February 1990. In November 1990, the PTO issued an office action rejecting thirty of the forty-one claims in the '345 Patent. In January 1991, Nilssen submitted his own affidavit and an affidavit of Fiene in support of arguments for patentability in an effort to overcome the rejections by the PTO examiner. Nilssen typed Fiene's affidavit. Fiene's affidavit did not disclose

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                      Page 7
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

that Fiene had a financial interest in Nilssen's electronic ballast patents, including the '345 Patent under re-examination, or that he had a professional relationship with Nilssen, dating back to 1978. Fiene's affidavit did include his history of working at Fyrnetics. Nilssen relied upon Fiene's affidavit in his January 1991 response to the PTO to distinguish two other patents-U.S. Patent Nos. 3,263,122 (Genuit) and 4,100,476 (Ghiringhelli)-from the '345 Patent. [FN3] At this time, Nilssen advised the PTO examiner: "To help analyze and evaluate the issues under dispute ... the Patent Owner solicited the assistance of two experts in the area directly pertinent to the ['345] patent under reexamination as to the cited patents." In another submission to the PTO, Nilssen stated: "In any rational administrative procedure, an expert's (i.e., Mr. Fiene's) interpretation of facts must prevail over the interpretation of facts by a non-expert (i.e., Examiner)."

Nilssen's affidavit did not disclose that Fiene had a financial interest in Nilssen's electronic ballasts, including the '345 Patent under reexamination. Nilssen's affidavit did not include references to Nilssen's prior work with Fyrnetics. Affidavits Nilssen previously filed in 1988 and 1989 had included specific disclosure of Nilssen's relationship with Fyrnetics. Although Nilssen had met Fiene while Fiene was employed at Fyrnetics, Fiene's affidavit did not disclose this information.

### The '690 Patent

In October 1990, Nilssen filed an application for the '690 Patent. On March 27, 1991, the PTO issued an office action rejecting all eighteen of Nilssen's original claims in the application that issued as the '690 Patent. In April 1991, Nilssen filed a response to the PTO's rejection. Nilssen included an affidavit from Fiene, executed April 1, 1991, in support of arguments for patentability. Fiene's April 1991 affidavit did not disclose to the PTO that Fiene had a financial interest in Nilssen's electronic ballast patents, including the '690 Patent. Fiene's affidavit also failed to disclose that Fiene had a professional relationship with Nilssen, dating back to 1978. Nilssen typed Fiene's April 1991 affidavit.

### (2) Small Entity Fee Claims and Payments

A patentee is required to pay an initial fee and subsequent maintenance fees for the term of the patent to prevent expiration of the patent. The PTO allows "small entities"-defined in C.F.R. 1 .9(f) as independent inventors, small business concerns, and nonprofit organizations-to pay reduced fees than that of a "large entity."

**\*4** Nilssen made specific large entity maintenance fee payments for certain patents, as follows:

| Year | Patent(s) | Fee Paid |
|---|---|---|
| 1996 | '637 | Four-year maintenance |
| 1998 | '043, '386 | Four-year maintenance |
| 1999 | '409, '074, '680, '681 | Four-year maintenance |
| 2000 | '637 | Eight-year maintenance |

maintenance fee payments for certain patents, as follows:

Nilssen made specific small entity claims and

| Patent | Month/Year | Small Entity Status | Small Entity Fee Paid |
|---|---|---|---|
| '806 | February 1997 | Claimed | Eight-year maintenance |
|  | January 2001 |  | Twelve-year maintenance |
| '270 | January 1997 | Claimed | Four-year maintenance |
|  | January 2001 | Claimed | Eight-year maintenance |
|  | January 2005 | Claimed | Twelve-year maintenance |
| '690 | March 1999 | Claimed |  |
|  | June 1999 |  | Eight-year maintenance |
|  | March 2003 |  | Twelve-year maintenance |

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

| '160 | June 1999 | Claimed | Four-year maintenance |
| | June 2003 | Claimed | Eight-year maintenance |
| '210 | August 1999 | Claimed | Issue fee |
| | June 2003 | Claimed | Four-year maintenance |
| '356 | November 2000 | Claimed | Eight-year maintenance |
| | November 2004 | Claimed | Twelve-year maintenance |
| '891 | September 2001 | Claimed | Four-year maintenance |
| '067 | February 2002 | | Eight-year maintenance |
| | March 2002 | Claimed | |
| '123 | March 2002 | Claimed | Eight-year maintenance |
| '043 | September 2002 | | Eight-year maintenance |
| | October 2002 | Claimed | |
| '386 | October 2002 | | Eight-year maintenance |
| | November 2002 | Claimed | |
| '409 | December 2002 | | Eight-year maintenance |
| | January 2003 | Claimed | |
| '074 | February 2003 | Claimed | |
| | June 2003 | | Eight-year maintenance |
| '680 | February 2003 | Claimed | |
| | October 2003 | | Eight-year maintenance |
| '681 | February 2003 | Claimed | |
| | October 2003 | | Eight-year maintenance |
| '118 | February 2003 | Claimed | Eight-year maintenance |
| '347 | February 2003 | Claimed | Eight-year maintenance |
| '637 | May 2004 | Claimed | Twelve-year maintenance |
| '342 | August 2004 | Claimed | Twelve-year maintenance |

### The Geo Foundation

In 1998 Nilssen established the Geo Foundation, Inc., in the Cayman Islands. The Geo Foundation holds Nilssen's patents under an exclusive license. The Geo Foundation does not conduct any business other than licensing and litigating Nilssen's patents. All of Nilssen's licensing revenues and lawsuit settlements are paid directly to the Geo Foundation. The Geo Foundation pays Nilssen 25 percent of its gross income. The Geo Foundation also pays all of the litigation costs associated with the patent lawsuits. All of the Geo Foundation's funds are held in a bank in Connecticut. The Geo Foundation has only one active director, Lars Evensen. Evensen lives in Norway and is Nilssen's nephew. Neither Nilssen nor Evensen has ever been to the Cayman Islands.

The Geo Foundation was established as a not-for-profit charitable organization. From its establishment in 1998 up until December 20, 2005, the Geo Foundation had not made a single charitable contribution. The Geo Foundation has never filed a tax return or paid any income tax.

*5 The stated goals of the Geo Foundation, as set by Nilssen, include the "development and establishment of a totally inflation-proof, fully-backed international currency system"; sovereign jurisdiction to assure that individuals' and corporations' "productive output [cannot be] forcibly taken by some governmental body"; and maintenance of class action lawsuits against the United States "seeking abolishment of the involuntary servitude to which a Small Class of high productivity U.S. Citizens (e.g., the upper 5% of all income tax payers) is presently subjected by virtue of the fact that a large part of the income of this Small Class is forcibly taken ... and given to another very Large Class of U.S. Citizens (e.g., the lower 50% of all income tax payers ... )."

The Geo Foundation's 1999 Overview disclosed that its goal was to preserve the wealth of the wealthy. In addition, the Geo Foundation follows the "Rose Law"-"a fact cannot be changed by giving it another name." The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Page 9

Geo Foundation interprets national laws and government actions under the Rose Law-"not recognizing as legitimate a government's natural tendency to legalize actions and practices ... which are clearly illegal under more basic laws ... for instance ..." taxes are illegal under the Takings Clause of the U.S. Constitution.

*Patent Licenses*

Nilssen entered into an agreement, the Compact Fluorescent Lamp Agreement ("CFL Agreement"), with Philips Electronics North America Corp., effective December 7, 1995. The CFL Agreement provides, in part: "Nilssen expects to offer CFL manufacturers a preferred running royalty rate under his CFL patents for a limited period starting the first quarter of 1996. Nilssen and Philips agree that Nilssen will offer and Philips will take a standard license from Nilssen under his CFL patents...." The CFL Agreement obligated Nilssen to license at least the following patents to Philips: the '806, '637, '356, '270, '067, '123, '347, '680, '681, and '201 Patents. Because Nilssen had an obligation to license to Philips, all of the patents subject to the CFL Agreement were not entitled to a small entity status and required payment of large entity fees.

Nilssen entered into a Patent License Agreement with Philips in January 1996. Philips employed more than 500 persons from December 7, 1995 to present. The Patent License Agreement obligated Nilssen to license at least the following patents to Philips: the '806, '690, '637, '342, '356, '067, '043, '386, '409, '347, '118, '074, '160, '680, '681, '819, and '210 Patents. Because of the Patent License Agreement with Philips as to these patents, Nilssen was not entitled to claim small entity status or pay small entity fees as to these patents.

*(3) Claimed Priority Dates*

A patent applicant may claim priority back from a later application to an earlier patent in order to obtain the benefit of the filing date of the earlier application. There are four requirements to claiming an earlier priority date: (1) the earlier description must have a written description of the invention and must have an enablement of the invention within it; (2) at least one of the inventors in each of the applications must be in common; (3) there must be co-pendency; and (4) there must be a cross reference of the applications, including their status as continuing, divisional or a continuation-in-part in the specification that is seeking the benefit.[FN4]

*6 The '409, '160, '386, '043, '118, and '819 Patents are

"children" of the '342 Patent. The '342 Patent was filed on February 25, 1992, and was issued on February 23, 1993. The '342 Patent claims to be a continuation of U.S. Patent Application No. 07/646,497, which it claims is a continuation of U.S. Patent Application No. 07/107,795, which it claims is a continuation-in-part of U.S. Patent Application No. 06/658,423, filed October 5, 1984. The '342 Patent and its parent applications do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/658,423, filed October 5, 1984. However, in the '409, '160, '386 and '043 Patents, Nilssen claims priority to U.S. Patent No. 4,184,128 ('128 Patent") to obtain an effective filing date of March 20, 1978. For the '409, '160, '386, and '043 Patents to have this effective filing date of March 20, 1978, the parent applications of the '409, '160, '386, and '043 Patents would have to specifically reference the '128 Patent and have been copending.

Nilssen's claim of priority to the effective filing date of March 20, 1978, in the '409, '160, '386, and '043 Patents was incorrect because the respective parent applications filed between 1984 and 1992 do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/658,423, filed October 5, 1984. Nilssen's claim of priority to the effective filing date of March 20, 1978, in these patents is also incorrect because these patents rely on the incorrect assertion by Nilssen that U.S. Patent Application No. 06/658,423 is a continuation-in-part of U.S. Patent Application No. 06/555,426. U.S. Patent Application No. 06/555,426 was previously abandoned when the PTO granted Nilssen's requested file wrapper continuation on August 27, 1984. Accordingly, U.S. Patent Application No. 06/658,423, filed October 5, 1984, cannot be a continuation-in-part of U.S. Patent Application No. 06/555,426, abandoned August 27, 1984, because the two applications were not copending at any point in time.

Lawrence J. Goffney, Jr., Defendants' expert on patent issues, was: from 1996 through 1998, Acting Deputy Assistant Secretary of Commerce and United States Patent and Trademark Office Deputy Commissioner of Patents and Trademarks; from 1994 through 1998, was Assistant Commissioner for Patents; and from 1984 through 1986, a patent examiner in the PTO. Nilssen's improper claim of priority to the effective date of March 20, 1978 was material to applications issuing as the '409, '160, '386, and '043 Patents because it allowed Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. This is based, in part, on Goffney's testimony, which was highly credible and unimpeached.

The '637, '680, and '681 Patents are "children" of U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Patent Application No. 06/787,692. U.S. Patent Application No. 06/787,692 was filed October 15, 1985, and abandoned September 30, 1991. U.S. Patent Application No. 06/787,692 claimed to be a continuation of U.S. Patent Application No. 06/644,155, which it claimed was a continuation of U.S. Patent Application No. 06/555,426, which it claimed was a continuation of U.S. Patent Application No. 06/178,107, filed August 14, 1980. The U.S. Patent Application No. 06/787,692 and its parent applications do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/178,107, filed August 14, 1980. In the '637, '680, and '681 Patents, however, Nilssen claims priority to the '128 Patent to obtain an effective date of March 20, 1978.

*7 The parent applications of the '637, '680, and '681 Patents would have to include a specific reference to the '128 Patent to permit the '637, '680, and '681 Patents to claim the '128 Patent priority date of March 20, 1978. Nilssen's claim of priority to the effective filing date of March 20, 1978, in the '637, '680, and '681 Patents is, therefore, incorrect because the respective patent applications filed between 1980 and 1990 do not claim priority to or cross reference any patents or patent applications earlier than Nilssen's U.S. Patent Application No. 06/178,107, filed August 14, 1980. Goffney testified that, in his opinion, Nilssen's incorrect claim of priority to the effective date of March 20, 1978 was material to the prosecution of the applications issuing as the '637, '680, and '681 Patents, at least at the time he filed the applications, because it would allow Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. Again, this testimony was highly credible and unimpeached.

*(4) Nondisclosure of Motorola Litigation*

On October 19, 1993, Nilssen filed a lawsuit against Motorola in the United States District Court for the Northern District of Illinois. Nilssen alleged that Motorola infringed U.S. Patent Nos. 5,191,262; 5,214,356; 5,013,974; 5,164,637; 5,047,690; and 5,185,560. Motorola denied the claims, alleging that the patents were invalid because they failed to meet the conditions of patentability and failed to comply with the requirements of 35 U.S.C. § § 102 (novelty requirement and loss of right), 103 (obviousness), and 112 (specification requirements). On July 23, 1996, the patent claims in the Motorola lawsuit were dismissed without prejudice. On September 3, 1996, Nilssen refiled a lawsuit against Motorola, alleging infringement of the same six patents and adding infringement allegations for nine additional U.S. Patents, Nos. 4,819,146; 4,857,806; 5,189,342;

5,214,356; 5,341,067; 5,402,043; 5,416,386; 5,432,409; and 4,677,345.

Eight of the patents at issue here were pending during the Motorola litigation, as follows: the '123 Patent, filed August 24, 1992, and issued August 30, 1994; the '043 Patent, filed September 23, 1993 and issued March 28, 1995; the '386 Patent, filed May 10, 1993, and issued May 16, 1995; the '409 Patent, filed February 2, 1994, and issued July 11, 1995; the '074 Patent, filed December 21, 1992, and issued December 26, 1995; the '160 Patent, filed October 28, 1994, and issued January 2, 1996; the '680 Patent, filed December 21, 1992, and issued January 2, 1996; and the '681 Patent, filed April 15, 1994, and issued April 23, 1996.

All of Nilssen's patents represent a common-end product-electronic ballasts. The '123, '074, and '681 Patents are direct descendants of patents asserted by Nilssen in his lawsuit against Motorola. The '123 Patent is a continuation-in-part of the '637 Patent asserted in the Motorola litigation. U.S. Patent 5,185,560 ('560 Patent") is a "great grandparent" of the '123 Patent. The '560 Patent is also a "grandparent" of the '074 Patent, related through a continuation-in-part application and a divisional application. The '560 Patent is also a "grandparent" of the '681 Patent, related through a file wrapper continuation and a continuation-in-part application.

*8 Nilssen did not disclose the pending Motorola litigation during the prosecution of the applications that issued as the '123, '043, '386, '409, '074, '160, '680, and '681 Patents in suit.[FN5] The '123, '043, '386, '409, '074, '160, '680, and '681 Patents are directed towards the same subject matter as the patents asserted by Nilssen in the Motorola litigation, based in part, on the expert opinion of Goffney.

*(5) Nondisclosure of Prior Art References*

U.S. Patent No. 4,251,752 ("Stolz Patent"), filed May 7, 1979, and issued February 17, 1981, constitutes prior art to the '681 Patent, pursuant to 35 U.S.C. § 102, and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '681 Patent. Nilssen had knowledge of the Stolz Patent, as demonstrated by citation to the Stolz Patent as prior art by Nilssen or patent examiners on at least twenty-five occasions in ten of Nilssen's other patent applications prior to the '681 Patent's being issued. Seven of the twenty-five references to the Stolz Patent as prior art occurred concurrently with the prosecution of the application that issued as the '681 Patent. The Stolz Patent was material to the patentability of claims in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 11
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

application that issued as the '681 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claims 6, 7, and 8 of the '681 Patent. The PTO had found a substantial new question of patentability and granted reexamination of the '681 Patent based, in part, on the Stolz Patent, further confirming its materiality. Nilssen failed to disclose the Stolz Patent during the application that issued as the '681 Patent.

Nilssen also failed to disclose the Stolz Patent during the prosecution of the application that issued as the '067 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '067 Patent. Nilssen had knowledge of the Stolz Patent because it was cited as prior art by Nilssen or patent examiners on at least eighteen occasions in eight of Nilssen's other patent applications before the '067 Patent was issued. The Stolz Patent was material to the patentability of claims in the application that issued as the '067 Patent because claims 4, 21 and 32 of the '067 Patent have been found to be invalid over the Stolz Patent.

U.S. Patent No. 4,045,711 ("Pitel Patent"), filed on March 19, 1976, and issued on August 30, 1997, constitutes 35 U.S.C. § 102 prior art to the '043 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '043 Patent. Nilssen had knowledge of the Pitel Patent because it was cited as prior art by Nilssen and patent examiners on at least thirty occasions in eight of Nilssen's other patent applications before the '043 Patent was issued. Three of the thirty references to the Pitel Patent as prior art occurred concurrently with the prosecution of the '043 Patent. The Pitel Patent was material to the patentability of claims in the application that issued as the '043 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claim 18 of the '043 Patent. Nilssen failed to disclose the Pitel Patent during the application that issued as the '043 Patent.

*9 U.S. Patent No. 4,461,980 ("Nilssen Patent"), filed on August 25, 1982, and issued on July 24, 1984, constitutes 35 U.S.C. § 102 prior art to the '043 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '043 Patent. Nilssen, as the sole inventor and prosecutor of the Nilssen Patent, had knowledge of the patent. In addition, the Nilssen Patent was cited as prior art by Nilssen and patent examiners on at least sixteen occasions in eight of Nilssen's other patent applications before the '043 Patent was issued. The Nilssen Patent was material to the patentability of claims in the application that issued as the '043 Patent because a reasonable examiner would have

considered this reference important in presenting a *prima facie* case of anticipation for at least claim 18 of the '043 Patent. Nilssen failed to disclose the Nilssen Patent during the application that issued as the '043 Patent.

U.S. Patent No. 4,053,813 ("Kornrumpf Patent"), filed on March 1, 1976, and issued on October 11, 1997, constitutes 35 U.S.C. § 102 prior art to the '043 Patent. The Kornrumpf Patent was not cumulative of the prior art made of record during the prosecution of the application that issued as the '043 Patent. Nilssen had knowledge of the Kornrumpf Patent because it was cited as prior art by Nilssen and patent examiners on at least eight occasions in six of Nilssen's other patent applications before the '043 Patent was issued. Two of the eight references to the Kornrumpf Patent as prior art occurred concurrently with the prosecution of the '043 Patent. The Kornrumpf Patent is material to the patentability of the claims in the application that issued as the '043 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claim 18 of the '043 Patent. The PTO had found a substantial new question of patentability and granted reexamination of the '043 Patent based on the Kornrumpf Patent. On December 15, 2005, the PTO issued an Office Action during the reexamination of the '043 Patent, rejecting claim 18 under 35 U.S.C. § 102(b) as anticipated by the Kornrumpf Patent. Nilssen failed to disclose the Kornrumpf Patent during the application that issued as the '043 Patent.

U.S. Patent No. 4,266,134 ("Franke Patent"), filed on December 13, 1978, and issued on May 5, 1981, constitutes 35 U.S.C. §§ 102 or 103 prior art to the '806 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the '806 Patent. Nilssen had knowledge of the Franke Patent because it was cited as prior art by Nilssen or patent examiners on at least three occasions in another of Nilssen's patent applications before the '806 Patent was issued. One of the three references to the Franke Patent as prior art occurred concurrently with the prosecution of the '806 Patent. The Franke Patent was material to the patentability of claims in the application that issued as the '806 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claims 5 and 6 of the '806 Patent. Nilssen failed to disclose the Franke Patent during the application that issued as the '806 Patent.

*10 U.S. Patent No. 4,392,087 ("Zansky Patent"), filed on November 26, 1980, and issued on July 5, 1983, constitutes 35 U.S.C. § 102 prior art to the '342 Patent and was not cumulative of the prior art made of record during the prosecution of the application that issued as the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

'342 Patent. Nilssen had knowledge of the Zansky Patent because it was cited as prior art by Nilssen and patent examiners on at least twelve occasions in ten of Nilssen's other patent applications before the '342 Patent was issued. Three of the twelve references to the Zansky Patent as prior art occurred concurrently with the prosecution of the '342 Patent. The Zansky Patent was material to the patentability of claims in the application that issued as the '342 Patent because a reasonable examiner would have considered this reference important in presenting a *prima facie* case of anticipation for at least claims 3, 14 and 15 of the '342 Patent. The PTO had found a substantial new question of patentability and granted reexamination of the '342 Patent based, in part, on the Zansky Patent. Nilssen failed to disclose the Zansky Patent during the application that issued as the '342 Patent.

Nilssen kept a "special file" in his office of prior art that was frequently cited by PTO examiners. The special file included the Stolz, Pitel and Zansky Patent references.

### (6) "Unclean Hands"

On numerous occasions, Nilssen inappropriately criticized patent examiners and the Board of Appeals. For example, in his petition to the Commissioner, Appeal No. 07/107,765, Nilssen stated that he "finds subject Examiner to be not only incompetent with respect to the particular subject matter of the various claimed inventions, but also seriously lacking in the basic mental facilities needed to properly perform his assigned role." In another petition to the Commissioner, Nilssen stated:
a) Mr. Dixon cannot be characterized as being skilled in the arts to which subject applications pertain ...
b) Mr. Dixon is severely deficient in his understanding and use of reason and logic ...
c) Mr. Dixon has an inadequate command of the English language ...
d) Mr. Dixon has repeatedly shown himself to be overtly non-cooperative and non-caring.

On several occasions, the PTO returned submitted papers to Nilssen, without consideration, for Nilssen's failure to conduct business with the PTO with "Decorum and Courtesy" in violation of 37 C.F.R. 1.3.

The PTO had informed Nilssen that he had submitted defective oaths because the oath submitted failed to include the phrase "in accordance with 37 C.F.R. 1.56(a)," as required by 37 C.F.R. 1.63(b)(3). In 1988, while prosecuting the '795 Patent application, the patent examiner referred Nilssen's application to the Office of the Assistant Commissioner of Patents (also known as the

"fraud squad") for "further consideration of the issues relating to the duty of disclosure." In January 1989, the Office of the Assistant Commissioner of Patents informed Nilssen that the investigation regarding the duty of disclosure issue related to the '795 Patent application was terminated because the Office of the Assistant Commissioner of Patents was no longer examining patent applications for compliance with 37 C.F.R. § 1.56.

### CONCLUSIONS OF LAW

*11 The Court has federal jurisdiction pursuant to 28 U.S.C. § 1338(a), and venue is proper pursuant to 28 U.S.C. § 1391.

[1][2] All patent applicants have an affirmative duty to prosecute patents in the PTO with candor and good faith. *See* 27 C.F.R. § 1 .56(a). The duty of candor extends throughout the entire prosecution history of the patent. *See Fox Indus., Inc. v. Structural Preservation Sys., Inc.,* 922 F.2d 801, 803 (Fed.Cir.1991) (*Fox* ). Inequitable conduct occurs when a patentee breaches his or her duty to the PTO of "candor, good faith, and honesty." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995) (*Molins* ). This conduct includes "affirmative misrepresentations of material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins,* 48 F.3d at 1178.

[3][4][5] The inequitable conduct analysis consists of two steps: (1) a determination of whether the conduct meets a threshold level of materiality and intent to mislead and (2) a weighing of the materiality and intent in light of all of the circumstances to determine whether the applicant's conduct is so culpable to render the patent unenforceable. *See Purdue Pharma L.P. v. Boehringer Ingelheim GMBH,* 237 F.3d 1359, 1366 (Fed.Cir.2001) (*Boehringer* ). The predicate facts must be proven by clear and convincing evidence. *See Dayco Prods., Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1362 (Fed.Cir.2003). A finding of inequitable conduct as to a single claim of a patent renders all claims of that patent unenforceable, even as to those claims not tainted by the inequitable conduct. *See Pharmacia Corp. v. Par Pharmaceutical, Inc.,* 417 F.3d 1369, 1374-75 (Fed.Cir.2005).

[6] Information is material under the "reasonable examiner" standard-if there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent-or under the narrower standard set forth in the amended Rule 56. *See Digital Control Inc. v. Charles Machine Works,* 437 F.3d 1309,

Page 13

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----)**

1314-16 (Fed.Cir.2006) (*Digital Control* ). Amended Rule 56 provides that information is "material" if:

[I]t is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied upon by the Office, or

(ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b)(2004). "[T]o the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower." *Digital Control*, 437 F.3d at 1316.

[7][8] The result of a PTO proceeding assessing patentability in light of information not previously disclosed can be of strong probative value in determining the materiality of the undisclosed information. *See Molins*, 48 F.3d at 1179. A PTO examiner need not rely on a misrepresentation in order for the misrepresentation to be material. *See Molins*, 48 F.3d at 1180.

*12 [9][10] Regarding the element of intent, direct evidence of intent to mislead or deceive is rare. Intent may be inferred from clear and convincing evidence of the surrounding circumstances. *See Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, 438 F.3d 1123, 1133-34 (Fed.Cir.2006) (*Purdue* ). The surrounding circumstances include the "facts and circumstances surrounding the applicant's conduct." *Molins*, 48 F.3d at 1181. However, intent cannot be inferred solely from the fact that the material was not disclosed; instead, there must be some factual basis for finding intent to mislead or deceive. *See Purdue*, 438 F.3d at 1134.

[11] When determining intent, the court must weigh all of the evidence, including evidence of good faith. *See Purdue*, 438 F.3d at 1134. If the materiality of the undisclosed information is relatively low, there is less basis to infer intent from materiality alone. On the other hand, if the undisclosed information is highly material, there can be an inference of the requisite intent to mislead or deceive. *See Purdue*, 438 F.3d at 1134.

[12][13][14][15] "[A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox*, 922 F.2d at 804. A patent that issues from a continuation or divisional application may be held unenforceable where (1) the applicant engaged in inequitable conduct with respect to the prosecution of an earlier related application in the chain leading to the challenged patent and (2) the inequitable conduct relates to the asserted claims of that patent. *See Semiconductor Energy Lab. v. Samsung Electronics Co.*, 24 F.Supp.2d 537, 543-44 (E.D.Va.1998), *aff'd on other grounds* 204 F.3d 1368 (Fed.Cir.2000) (*Semiconductor* ); *eSpeed, Inc. v. Brokertec USA*, 417 F.Supp.2d 580, 595 (D.Del.2006) (*eSpeed* ). However, the mere occurrence of inequitable conduct in connection with an application in a chain of applications is not sufficient to invalidate a patent issued as a result of a later application in that chain; instead, the earlier inequitable conduct in the chain must be related to the targeted claims of the ultimately issued patents sought to be enforced. *See Semiconductor, 24 F.Supp.2d at 543*. Generally, mere similarity in subject matter, mere citation to the unenforceable patent, and sharing a parent application are insufficient to invalidate a patent issued from a chain of applications in which inequitable conduct has been found as to an application within that chain. *See Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1331-32 (Fed.Cir.2004) (*Baxter* ); *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F.Supp.2d 1011, 1021-22 (N.D.Cal.2004) (*Hoffman-La Roche* ).

[16][17] Inequitable conduct can be cured by an applicant by: (1) expressly advising the PTO of the misrepresentation's existence, (2) advising the PTO of what the actual facts are and making it clear that further examination in light thereof may be required if any PTO action has been based on the misrepresentation, and (3) establishing patentability on the basis of the factually accurate record. *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1572 (Fed.Cir.1983). Curing inequitable conduct cannot be made through manipulation of the patent prosecution procedures, such as amending or cancelling claims or filing continuation and divisional applications. *See Semiconductor, 24 F.Supp.2d at 544-45*.

*13 [18][19] The doctrine of unclean hands can apply where a plaintiff engages in misconduct related to a patent at issue. *See Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-46, 54 S.Ct. 146, 78 L.Ed. 293 (1933) (*Keystone* ); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed.Cir.1990) (*Consolidated* ). Under the doctrine of unclean hands, inequitable conduct can render all patent claims having an "immediate and necessary relation" to that conduct unenforceable as to a single patent or to a series of related patents. *See Keystone*, 290 U.S. at 245-46; *Consolidated*, 910 F.2d at 812.

### DECISION

*(1) Inequitable Conduct Based on Fiene Affidavit*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Page 14

[20] Patent examiners have broad authority to request information they deem relevant to the issue of patentability. *See Ferring B.V. v. Barr Laboratories, Inc.,* 437 F.3d 1181, 1187 (Fed.Cir.2006) (*Ferring* ). "Given the *ex parte* nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by the applicant." *Ferring,* 437 F.3d at 1187.

[21][22][23] PTO examiners are specifically informed that affidavits and declarations are to be scrutinized closely and the facts weighed with care, including the affiant's or declarant's interest in the outcome of the application. *See* MPEP § 716.01(c); *Ferring,* 437 F.3d at 1187. A declarant's prior or present relationship with the patent application may be material, and failure to disclose that relationship may constitute inequitable conduct. *See Ferring,* 437 F.3d at 1187; *Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1581-82 (Fed.Cir.1996) (*Refac* ); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1191-92 (Fed.Cir.1993). A declarant's relationship with the applicant is material if: (1) the declarant's views on the underlying issue are material and (2) the relationship to the applicant is significant. *Ferring,* 437 F.3d at 1188. Generally, "[a]ffidavits are inherently material"; and the "affirmative act of submitting an affidavit must be construed as being intended to be relied upon." *Refac,* 81 F.3d at 1583.

The question of intent is directed at the applicant's intent, not the intent of the declarant. *See Ferring,* 437 F.3d at 1191. Multiple omissions of past relationships heighten the seriousness of the conduct. *See Ferring,* 437 F.3d at 1194.

[24] Nilssen knowingly submitted Fiene's affidavits in response to the PTO's reexamination of the '345 Patent in an attempt to address the examiner's rejection of certain claims. Nilssen knowingly submitted Fiene's affidavit when addressing the PTO's rejection of claims within the '690 Patent application. Fiene's declarations in the affidavit were highly material to the reexamination of the '345 Patent, and a reasonable patent examiner would have considered the information important. Fiene's declarations in the affidavit were highly material to the '690 Patent application, and a reasonable patent examiner would have considered the information important. Nilssen and Fiene had a significant relationship-personal, professional, and financial-when the affidavits were prepared and submitted. On more than one occasion, Nilssen knowingly failed to inform the PTO of this significant relationship and took active steps to conceal that

relationship, *i.e.,* removing his history of employment at Fyrnetics, which could have linked Nilssen and Fiene. Nilssen's testimony to the contrary was not credible, and the evidence showed that Nilssen intended to mislead the PTO.[FN6] The level of materiality and Nilssen's intent in light of all of the circumstances establish that Nilssen engaged in inequitable conduct during the '345 Patent reexamination and '690 Patent application by clear and convincing evidence to render the patents unenforceable.

*14 [25] However, the '345 Patent is no longer at issue in this case. Osram seeks to have the '270 and '681 Patents, which are still at issue, invalidated under the doctrine of infectious unenforceability, arguing that the reference to the '345 Patent in the description of prior art in the '270 and '681 Patents is sufficiently related to render the '270 and '681 Patents unenforceable. In support of its argument, Osram argues that Nilssen's proposed standard of "immediate and necessary relation" required for infectious unenforceability has not been adopted by the Federal Circuit. However, while the "immediate and necessary relation" standard has not been "adopted" by the Federal Circuit for purposes of infectious unenforceability, because it has not decided the issue, the Federal Circuit has referred to that standard. *See Consolidated Aluminum Corp. v. Forseco Int'l Ltd.,* 910 F.2d 804, 810-11 (Fed.Cir.1990). Furthermore, the Federal Circuit has specifically held that "where claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application." *Baxter,* 149 F.3d at 1332.

Here, the application that issued as the '345 Patent was a divisional application,[FN7] and the primary relationship Osram identifies between the '345 and the '270 and '681 Patents is the reference of the '345 Patent in those patents and sharing a common parent application. The mere reference to the '345 Patent in the description of prior art in the '270 and '681 Patents and the sharing of a common parent application and applicant does not demonstrate sufficient relatedness to the '345 Patent to render the '270 or '681 Patents unenforceable under the doctrine of infectious unenforceability. *See Baxter,* 149 F.3d at 1331-32; *Hoffma-La Roche,* 319 F.Supp.2d at 1021-22.

*(2) Inequitable Conduct Based on Small Entity Status Claims and Fees*

As noted above, a patentee is required to pay an initial issue fee and subsequent maintenance fees every four

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

years for the term of the patent to prevent expiration of the patent. 35 U.S.C. § 41. Following increases in these fees, Congress-concerned that the increased fees would be overly burdensome to individuals, non-for-profit organizations, and small businesses-provided a discount in the amount of fees for these "small entities." See Ulead Sys., Inc. v. Lex Computer & Mgt. Corp., 351 F.3d 1139, 1142 (Fed.Cir.2003) (Ulead).

A small entity is defined as "an independent inventor, a small business concern, or a nonprofit organization." 37 C.F.R. § 1.27(a). An "independent inventor" is defined as:
any inventor who (1) has not assigned, granted, conveyed, or licensed, and (2) is under no obligation under contract or law to assign, grant convey, or license, any rights in the invention to any person who could not otherwise be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section."

*15 37 C.F.R. § 1.27(a)(1).

A "small business concern" is defined as:
one whose number of employees, including those of its affiliates, does not exceed 500 persons and which has not assigned, granted, conveyed, or licensed, and is under no obligation under contract or law to assign, grant, convey, license, any rights in the invention to any person who could be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section.

37 C.F.R. § 1.9(d).

A "nonprofit organization," up until August 2001, was defined, in pertinent part, as:
(2) an organization of the type described in Section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) and exempt from taxation under section 510(a) of the Internal Revenue Code (26 U.S.C. 501(a)); (3) any nonprofit scientific or educational organization qualified under a nonprofit organization statute of a state in this country (35 U.S.C. 201(j)); or (4) any nonprofit organization under paragraphs (e)(2) or (3) of those sections if it were located in this country.

37 C.F.R. § 127(a)(3).

In August 2001, the definition of a nonprofit organization, in pertinent part, was amended to:
any nonprofit organization that: (i) Has not assigned, granted, conveyed, or licensed, and is under no obligation

under contract or law to assign, grant, convey, or license, any rights in the invention to any person, concern, or organization which would not qualify as a person, small business concern, or a nonprofit organization; and (ii) Is either: (A) A university or other institution of higher education located in any country; (B) An organization of the type described in section 501(c)(3) of the Internal Revenue Code ...; (C) Any nonprofit scientific or educational organization qualified under a nonprofit organization statute of a state of this country (35 U.S.C. 201(i)); or (D) Any nonprofit organization located in a foreign country which would qualify as a nonprofit organization under paragraphs (a)(3)(ii)(B) of this section or (a)(3)(ii)(c) of this section if it were located in this country.

37 C.F.R. § 1.27(a)(3). Any party making an assertion of small entity status must make a declaration claiming small entity status. See 37 C.F.R. § 1.27(c); MPEP § 509.03; MPEP § 2250.

[26][27] False declarations and improper fee payments may constitute inequitable conduct. See Ulead, 351 F.3d at 1145-46. A false declaration of small entity status is material as a matter of law because the PTO's acceptance of a declaration and the resulting reduced fees is material to the survival of the patent. See Ulead, 351 F.3d at 1146. In addition, Section 1.28(c) allows a patentee to correct an error in making a small entity payment if the status as a small entity is established in good faith and the fees as a small entity are paid in good faith. See 37 C.F.R. § 1.28(c). While the PTO is not required to make an inquiry into whether the patentee has established good faith as a condition of accepting a late payment, if a patentee seeks to correct an incorrect payment of fees as a small entity pursuant to Section 1.28(c) without good faith, the patentee may be found to have engaged in inequitable conduct. See Ulead, 351 F.3d at 1149-50.

*16 [28] Effective December 7, 1995, Nilssen entered into the CFL Agreement; at which time Nilssen was not entitled to, but did, claim small entity status and paid small entity maintenance fees as to the '806, '637, '270, 123, '680, and '681 Patents. Effective January 1, 1996, Nilssen entered into a Patent License Agreement with Philips; at which time Nilssen was not entitled to, but did, claim small entity status and paid small entity maintenance fees as to the '806, '637, '043, '386, '409, '074, '160, '680, and '681 Patents. From December 1995 to the time of trial, Nilssen made at least twenty-seven improper payments to the PTO in both the eleven patents in suit and nine patents Nilssen withdrew from the case. In this same time frame, Nilssen submitted at least fifteen declarations to the PTO claiming small entity status, including eight patents in suit and seven withdrawn

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

patents.

Nilssen acted with intent to mislead in declaring small entity status and in making small entity payments. Nilssen made multiple false declarations and small entity payments over several years. Nilssen's testimony as to why he believed he was entitled to small entity declarations and payments was not credible. Nilssen, a self-proclaimed expert in patent prosecution, had years of experience prosecuting and maintaining his patents. Nilssen regularly completed the required forms affirmatively declaring his status as a small entity. These forms, entitled "Verified Statement (Declaration) Claiming Small Entity Status," were signed by Nilssen under oath. The "Verified Statement" put Nilssen on notice of the specific C.F.R. provisions governing small entity status.

Nilssen's assertion that he did not read the applicable C.F.R. provisions is not credible. The evidence showed that Nilssen was knowledgeable of and understood patent law and the MPEP during the prosecution of his patents. During his testimony, Nilssen also admitted that he read the MPEP section that incorporated the very C.F.R. provisions at issue. Nilssen, unconvincingly, testified during the trial that his actions this regard should be excused and that he erred in good faith because he did not understand certain regulations.

Nilssen also asserted that he "justifiably believed he could make small entity payments on any patents transferred to Geo" because the MPEP prior to August 2001 "implied" that Nilssen was entitled to pay small entity fees for all such patents. This version specifically stated, under the heading "Transfer of Rights" the following:
The payment of reduced fees under 35 U.S.C. 41 is limited to those situations in which all rights in the invention are owned by small entities ... To do so otherwise would be clearly contrary to the intended purpose of the legislation which contains no indication that fees are to be reduced in circumstances where rights are owned by non-small entities.

Nilssen claims, as evidence of his perceived ambiguity of this section, the August 2001 amendment now makes it clear that he was required to make large entity payments; however, he asserts he was unaware of the amendment until recently. Nilssen's testimony that he was knowledgeable of a specific provision in the MPEP (the pre-August 2001 version), which permitted him to draw an interpretation of the law he believes is favorable to him, but ignorant of the August 2001 amendment is not credible. Moreover, his unbelievable explanation belies his assertion that his improper small entity claims were

the result of a good faith mistake. Essentially, Nilssen is claiming that he ceased being informed on the requirements to qualify for small entity fees at a time when, coincidentally, the law was changed to his apparent detriment.[FN8]

*17 [29] Nilssen's unconvincing reliance on the GEO Foundation to excuse his declarations and small entity payments is also unavailing.[FN9] As discussed above, Nilssen was required to pay large entity fees for all patents licensed to the Geo Foundation because the Geo Foundation itself licensed the patents to large entities. Furthermore, the Geo Foundation's lack of any charitable activity, as well as its announced goals and mission statement, set by Nilssen himself, demonstrates that the Geo Foundation could not properly be classified as a non-for-profit corporation.

Lastly, Nilssen's argument that he would not have intentionally paid small entity fees because the amount of money he was saving was too small relative to what he might lose if his patents were declared unenforceable is without merit.[FN10] However, considering only the portion of Nilssen's portfolio licensed to Philips, Nilssen would owe in excess of $200,000 in underpayments, a significant amount of money. Nilssen also admittedly opposes government fees, taxes, and the present legal system which, further demonstrates an incentive to avoid payment.

Based on clear and convincing evidence, in light of the materiality and considering the totality of circumstances supporting Nilssen's obvious intent to mislead, Nilssen's declarations of small entity status and small entity payments render Nilssen's repeated misconduct so culpable as to render the patents at issue unenforceable.

### (3) Inequitable Conduct Based on Priority Misclaims

[30] False statements regarding an application priority date may constitute inequitable conduct. See Li Second Family L.P. v. Toshiba Corp., 231 F.3d 1373, 1378-79 (Fed.Cir.200) (Li ); KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1575-76 (Fed.Cir.1985) (KangaROOS ). "Because the effective filing date of each claim in a patent application determines which references are available as prior art for purposes of § § 102 and 103, information regarding the effective date is of the utmost importance to an examiner. Consequently, an applicant's misrepresentation that he is entitled to the benefit of an earlier filing date is highly material." Li, 231 F.3d at 1379-80 (inequitable conduct where applicant made affirmative assertions of an effective filing date without informing the PTO that the Examiner and Board of

Appeals had rejected the same arguments that had been made earlier with respect to the prosecution of an earlier patent. Inequitable conduct has not been found by merely "claiming priority to an earlier patent where the specifications, but not the claims, of the later patents are supported by the earlier patent." *Boehringer*, 237 F.3d at 1367 (finding no inequitable conduct by applicant that incorrectly claimed priority to an earlier patent but did not actively mislead the examiner).

For the period ending August 2001, 35 U.S.C. § 120 provided:
An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if files [sic] before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain specific reference to the earlier filed application.

**\*18** 35 U.S.C. § 120.

Beginning August 2001, 35 U.S.C. § 120 states:
An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. No application shall be entitled to the benefit of an earlier filed application under this section unless an amendment containing the specific reference to the earlier filed application is submitted at such time during the pendency of the application as required by the Director. The Director may consider the failure to submit such an amendment within that time period as a waiver of any benefit under this section. The Director may establish procedures, including the payment of a surcharge, to accept an unintentionally delayed submission of an amendment under this section.

35 U.S.C. § 120.

Four conditions exist to receive the benefit of an earlier filing date under Section 120:
(1) The second application (which is called a continuing application) must be an application for a patent for an invention which is also disclosed in the first application (the parent or original application); the disclosure of the invention in the first application and in the second application must be sufficient to comply with the requirements of the first paragraph of 35 U.S.C. 112.... (2) The continuing application must be copending with the first application or with an application similarly entitled to the benefit of the filing date of the first application. (3) The continuing application must contain a specific reference to the prior application(s) in the specification ... (4) The continuing application must be 'filed by the same inventor' as in the prior application....

MPEP § 210.11.

"Copendency is defined in the clause that requires that the second application must be filed before (a) the patenting, or (b) the abandonment of, or (c) the termination of proceedings in the first application. MPEP § 201.11. "If the first application is abandoned, the second application must be filed before the abandonment in order for it to be copending with the first." MPEP § 201.11. "Abandonment" refers to "express abandonment." MPEP § 201.11. The specific reference to the first application, which is required by the third requirement, "should appear as the first sentence of the specification following the title preferably as a separate paragraph (37 C.F.R. 1.78(a))." MPEP § 201.11.

**\*19** "A continuation is a second application for the same invention claimed in a prior application and filed before the original becomes abandoned." MPEP § 201.07. "A continuation-in-part is an application filed during the lifetime of an earlier application by the same applicant, repeating some substantial portion or all of the earlier application and adding subject matter not disclosed in the said earlier case." MPEP § 201.08. Section 201.11 of the MPEP provides:
Any claim in a continuation-in-part application which is directed solely to the subject matter adequately disclosed under 35 U.S.C. 112 in the parent application is entitled to the benefit of the filing date of the parent application. However, if a claim in a continuation-in-part application recites a feature which is not disclosed or adequately supported by a proper disclosure under Section 35 U.S.C. 112 in the parent application, but which was first introduced or adequately supported in the continuation-in-part application, such a claim is entitled to the filing date of the continuation-in-part application.

MPEP § 201.08, *citing In re Van Lagenhoven*, 59 C.C.P.A. 934, 458 F.2d 132, at 136, 173 USPQ 426 at

429 (CCPA 1972) and *Chromalloy American Corp. v. Alloy Surfaces Co., Inc.,* 339 F.Supp. 859, 874, 173 USPQ 295 at 306 (D.Del.1972).

Section 201.11 of the MPEP provides, in pertinent part:
A claim in a subsequently filed application that relies on a combination of prior applications may not be entitled to the benefit of an earlier filing date under 35 U.S.C. 120 since 35 U.S.C. 120 requires that the earlier filed application contain a disclosure which complies with 25 U.S.C. 112, first paragraph for each claim in the subsequently filed application.

MPEP § 201.11, *citing Studiengesellschaft Kohle m.B.H. v. Shell Oil Co.,* 112 F.3d 1561, 1564, 42 USPQ2d 1674 (Fed.Cir.1997).

A divisional application is a "later application for a distinct or independent invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier application or parent application." MPEP § 201.06(a). A file wrapper continuation is a "continuation, continuation-in-part, or divisional application which uses the specification and drawings from a prior application to be abandoned [and] filed before the payment of the issue fee, abandonment of, or termination of proceedings on a prior claim...." MPEP 201.06(b). The filing of a request for a continuing application pursuant to the file wrapper continuing procedure is "considered to be a request to expressly abandon the prior application as of the filing date granted the continuing application." MPEP § 201.06(b). "Use of the FWC procedure will automatically result in express abandonment of the prior application as of the filing date accorded the continuation, continuation-in-part, or divisional application." MPEP § 201.06(b). Further, the "filing of a request for a continuing application under 37 C.F.R. 1.62(g) is considered to be a request to expressly abandon the prior application as of the filing date granted the continuing application." MPEP § 201 § 711.01.

*20 Nilssen's claim of priority to the effective date of March 20, 1978, in the '409, '160, '386, and '043 Patents were false because the copendency and cross-reference requirements were not satisfied. Likewise, Nilssen's claim of priority to the effective date of March 20, 1978, in the '637, '680, and '681 Patents were false because the cross-reference requirement was not satisfied.

[31] These false claims of priority dates were highly material because they allowed Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled. *See Li,* 231 F.3d at 1379-80.

Furthermore, Nilssen intended to mislead the PTO by

incorrectly claiming priority dates. The '409, '160, '386, and '043 Patents are all children of the '342 Patent. From 1984 to 1992, the '342 Patent and its parent applications did not claim priority to any patents or parent applications before October 5, 1984. On February 22, 1993, Nilssen filed Application No. 08/020,696 as a continuation of the '342 Patent application. However, this time, Nilssen claimed priority back to March 20, 1978. Just days before this new claim of priority, on February 18, 1993, Nilssen sent a letter to his licensee, Advance Transformer Co., disclosing his intent to obtain patent protection on the "Epsilon Project." In the letter, Nilssen stated:
A patent application aimed at attaining patent protection for various features of the initial Epsi-type Electronic Ballast has been prepared and will be filed shortly. This patent application will be a Continuation-In-Part of currently pending patent application Serial No. 07/840,52[8] filed 02/25/92.
Since many of the constituent parts of the Epsi-type Inverter/Ballast design may be considered as representing known art, it may not be possible to attain effective basic patent protection on all the important features of the Epsi-type Electronic Ballast.

The Application No. 07/840,528, referred to in the letter, is the same application that issued as the '342 Patent.

As indicated in his letter to Advance, Nilssen filed Application No. 08/020,696 (whose file wrapper continuation issued as the '160 Patent) four days later as a continuation-in-part of Application No. 07/840,528. Unlike Application No. 07/840,528, and all other preceding applications, Nilssen claimed priority back to 1978. The priority misclaims in the '409, '160, '386, and '043 Patents all followed. The Advance letter demonstrates that Nilssen intentionally misclaimed priority in these patents to avoid known prior art and to obtain "effective basic patent protection." Nilssen's testimony to the contrary was unpersuasive.

Nilssen engaged in similar conduct as to the '637, '680, and '681 Patents. These patents are all children of Application No. 06/787,692. Between August 1980 and July 1991, Application No. 06/787,692 and all its preceding applications claimed priority to dates no earlier than August 14, 1980. On August 9, 1991, Nilssen filed Application No. 07/743,216, issuing as the '637 Patent, and, for the first time, claimed priority back to March 18, 1978. The priority misclaims in the '680 and '681 Patents followed.

*21 Again, shortly before the new priority claim date, on March 6, 1991, Nilssen sent a letter to Advance regarding the "Omega Ballast." Nilssen wrote, in pertinent part:
However, I also mentioned to you that I may not be able

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Page 19

to attain effective patent coverage on the Omega Ballast; which presents me with a dilemma.
This dilemma relates to the fact that Advance is free to cancel its License Agreement with me at any time after June 30, 1993. Thus, if it should turn out that the Omega Ballast were to lack effective patent protection, I would have to recognize that Advance might indeed cancel its License Agreement with me while proceeding to make and sell the Omega Ballast.

The priority misclaims in the '637, '680, and '681 Patents all followed. This Advance letter demonstrates that Nilssen intentionally misclaimed priority in these patents to claim an earlier effective date to assure that Advance could not cancel its License Agreement. Nilssen's testimony to the contrary was not credible.

Based on clear and convincing evidence, in light of the materiality and the totality of circumstances as to Nilssen's intent to mislead, Nilssen's false claims of priority dates render Nilssen's repeated misconduct so culpable as to render the '409, '160, '386, '043, '637, '680, and '681 Patents unenforceable.

*(4) Inequitable Conduct Based on Failure to Disclose Litigation*

[32][33] Section 2001.06(c) of the MPEP provides:
Where the subject matter for which a patent is being sought is, or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the Patent and Trademark Office; such as, for example, evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of 'fraud', inequitable conduct' or violation of duty of disclosure. Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents, and testimony.

MPEP § 2001.06(c). Failure to disclose related litigation may constitute inequitable conduct. *See Critikon, Inc. v. Becton Dickinson Vascular Access, 120 F.3d 1253, 1255 (Fed.Cir.1997) (Critikon ); Nisus Corp. v. Perma-Chink Sys., Inc. 421 F.Supp.2d 1084, 1104 (E.D.Tenn.2006)* (*Nisus* ). " 'Related litigation' is *per se* material information covered by the duty of disclosure." *Nisus, 421 F.Supp.2d at 1104.* "It is axiomatic that "[c]lose cases should be resolved by disclosure, not unilaterally by applicant." ' *Critikon, 120 F.3d at 1257, quoting LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n, 958 F.2d 1066 (Fed.Cir.1992).*

[34] Ongoing litigation is material if the patent involved in the litigation shares the same specification and discloses the same subject matter as the pending patent. Materiality of ongoing litigation is "obvious" if it challenged the validity and enforceability of the subject matter of the pending application. *See ICU Medical, Inc. v. B. Braun Medical, Inc., 2005 WL 588341 at *15 (N.D.Ill. March 14, 2005).* When addressing "intent" for failing to disclose related litigation, the Federal Circuit has held:
*22 No single factor or combination of factors can be said always to require an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*Critikon, 120 F.3d at 1257.*

[35] The '123, '043, '386, '409, '074, '160, '680, and '681 Patents disclose the same subject matter as the patents asserted by Nilssen in the Motorola litigation. Nilssen was aware of the pending Motorola litigation during the prosecution of the '123, '043, '386, '409, '074, '160, '680, and '681 Patents. Nilssen's failure to disclose the Motorola litigation was highly material to the prosecution of the applications that issued as the '123, '043, '386, '409, '074, '160, '680, and '681 Patents. Nilssen's testimony that he was unaware of a duty to disclose the Motorola litigation was not credible. Nilssen intended to mislead the PTO by failing to disclose the ongoing Motorola litigation and did not do so in good faith. Based on clear and convincing evidence, in light of the materiality and considering the totality of circumstances reflecting Nilssen's intent to mislead, Nilssen's failure to disclose the pending Motorola litigation is so culpable as to render the '123, '043, '386, '409, '074, '160, '680, and '681 Patents unenforceable.

*(5) Inequitable Conduct Based on Failure to Disclose Prior Art*

[36][37][38] Inequitable conduct can arise from the failure to disclose prior art. *See Molins, 48 F.3d at 1178.* To prevail on a charge of inequitable conduct for failure to disclose prior art, the defendant must demonstrate "materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead." *Molins, 48 F.3d at 1178.* A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----)**

Page 20

reference may be material even though the claims of an application are patentable over that reference. *See Molins,* 48 F.3d at 1179.

[39] The Stolz Patent constitutes prior art to the '681 and '067 Patents. The Stolz Patent was highly material to the '681 and '067 Patents. Nilssen had knowledge of the Stolz Patent and of its materiality. Nilssen failed to disclose the Stolz Patent with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. In light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Stolz Patent constitutes inequitable conduct and conduct of a degree to render the '681 and '067 Patents unenforceable.

The Pitel, Nilssen and Kornrumpf Patents constitute prior art to the '043 Patent, The Pitel, Nilssen and Kornrumpf Patents were highly material to the '043 Patent. Nilssen had knowledge of the Pitel, Nilssen and Kornrumpf Patents and of their materiality. Nilssen failed to disclose the Pitel, Nilssen and Kornrumpf Patents with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. In light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Pitel, Nilssen and Kornrumpf Patents constitutes inequitable conduct of a degree to render the '043 Patent unenforceable.

**\*23** The Franke Patent constitutes prior art to the '806 Patent. The Franke Patent was highly material to the '806 Patent. Nilssen had knowledge of the Franke Patent and of its materiality. Nilssen failed to disclose the Franke Patent with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary and considering the totality of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the Franke Patent constitutes inequitable conduct of a degree to render the '806 Patent unenforceable.

The Zansky Patent constitutes prior art to the '342 Patent. The Zansky Patent was highly material to the '342 Patent. Nilssen had knowledge of the Zansky Patent and of its materiality. Nilssen failed to disclose the Zansky Patent with the intent to mislead the PTO; and, when he failed to do so, he was not acting in good faith. Nilssen's testimony to the contrary was not credible. Based on clear and convincing evidence, in light of the materiality and considering the totality of the circumstances as to Nilssen's intent to mislead, Nilssen's failure to disclose the

Zansky Patent constitutes inequitable conduct to a degree to render the '342 Patent unenforceable.

[40] However, the descendant relationship of the '123, '409, '160, '386, and '043 Patents to the '342 Patent and the common drawings among them does not demonstrate sufficient relatedness to the '342 Patent to render the '123, '409, '160, '386, and '043 Patents unenforceable under the doctrine of infectious unenforceability. Mere similarity in subject matter and sharing a parent application are insufficient to invalidate a patent issued from a chain of applications in which inequitable conduct has been found as to an application within that chain. *See Baxter,* 149 F.3d at 1331-32; *Hoffman-La Roche,* 319 F.Supp.2d at 1021-22.

*(6) Unclean Hands*

Lastly, Defendants seek to have each of the related patents in suit held unenforceable under the doctrine of unclean hands based on the inequitable conduct that directly renders the patents in suit unenforceable. While the above findings demonstrate that Nilssen engaged in a pattern of inequitable conduct over an extended period of time, Defendants have not demonstrated by clear and convincing evidence that the inequitable conduct engaged in by Nilssen that directly renders certain patents unenforceable had an immediate and necessary relation to other related patents to render the other patents unenforceable under the doctrine of unclean hands. *See Baxter,* 149 F.3d at 1331-32; *Hoffman-La Roche,* 319 F.Supp.2d at 1021-22.

CONCLUSION

For the foregoing reasons, Defendants have demonstrated, by clear and convincing evidence, that Nilssen engaged in inequitable conduct and that such conduct renders the remaining eleven patents at issue unenforceable. Judgment is entered in favor of Defendants and against Plaintiffs.

FN1. There is no right to a jury trial as to inequitable conduct. *See Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1190 (Fed.Cir.1993).

FN2. The '345 Patent is no longer a patent in suit but is relevant because of claimed infectious enforceability, as discussed later.

FN3. The "Description of Prior Art" in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Page 21

"Background of the Invention" of the '270 and '681 Patents state: "For a description of pertinent prior art, reference is made to [the '345 Patent] to Nilssen ..." Additional prior art referenced in the '681 and '270 Patents includes U.S. Patent Nos. 3,263,122 (Genuit) and 4,100,476 (Ghiringhelli).

FN4. More detailed discussions of priority dates and of these related terms are included in the Conclusions of Law and Decision sections of this Opinion and Order.

FN5. Nor did Nilssen disclose the existence of the Motorola litigation then pending during the prosecution of the applications of the '067, '347, '118, '819, and '210 Patents, for which allegations of infringement have been withdrawn in this suit.

FN6. Nilssen originally argued at trial that the Nilssen/Fiene relationship was readily apparent to the PTO based on the inclusion with the affidavit of Fiene's telephone number because the last digit is only two numbers away from Nilssen's telephone number (phone numbers with the same prefix ending in 5617 and 5615), which was also disclosed in the same filing. It was later developed at trial that Fiene's and Nilssen's phone numbers appeared in these papers sixteen pages apart. Nilssen has apparently abandoned this argument.

FN7. This term is discussed more fully later in this Opinion and Order.

FN8. See MPEP § 2550 ("37 C.F.R. 1.366(f) serves as a reminder to patentees of the necessity to check for the loss of small entity status prior to paying each maintenance fee on a patent. This is also a requirement of 37 C.F.R. 1.28(b). The notification of any change in status resulting in loss of entitlement to small entity status must be filed in a patent prior to paying, or at the time of paying, the earliest maintenance fee due after the date on which status as a small entity is no longer appropriate.").

FN9. At trial, Nilssen argued that he was merely relying on his advice of counsel in believing that the GEO Foundation was a non-for-profit organization, relieving Nilssen from paying large entity fees. Nilssen did not present this defense until the time of trial and withheld discovery from his counsel based on attorney-client privilege. Furthermore, Nilssen's counsel's

opinions as to the Geo Foundation's non-for-profit status were formed from the information provided by Nilssen. For example, Nilssen's counsel wrongly assumed that Nilssen was not part of the Geo Foundation's formation and that the Geo Foundation had engaged in charitable activities.

FN10. People are dishonest and break the law even when small amounts of money are at stake. See DaimlerChrysler AG v. Feuling Advanced Techs., Inc., 276 F.Supp.2d 1054, 1062 (S.D.Cal.2003) ("Why [patentee] and his agents would put the enforceability of patents licensed for millions of dollars at risk to save a few thousand dollars in PTO fees is beyond reason. Yet, the evidence overwhelmingly supports the inference that they did so, and common experience confirms that the world has no shortage of individuals who commit irrational and self-destructive acts.").

N.D.Ill.,2006.
Nilssen v. Osram Sylvania, Inc.
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1679734 (Trial Motion, Memorandum and Affidavit) Defendant Osram's Post-Trial Closing Argument Reply Brief (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 1040130 (Trial Motion, Memorandum and Affidavit) Defendant Osram's Post-Trial Closing Argument Brief (Mar. 14, 2006) Original Image of this Document (PDF)
• 2005 WL 3286098 (Trial Motion, Memorandum and Affidavit) Osram's Opposition to Plaintiffs' Motion to cause the Special Master to Resume Work on the Claim Construction Issues. (Oct. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 3286100 (Trial Motion, Memorandum and Affidavit) Osram's Opposition to Plaintiffs' Motion for A Protective Order Concerning Osram's Requests for Admission (Oct. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 3286095 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Vacate Discovery Cutoff and Trial Dates (Oct. 18, 2005) Original Image of this Document (PDF)
• 2005 WL 3286087 (Trial Motion, Memorandum and Affidavit) Osram's Motion to Vacate the Discovery Cutoff and Trial Dates Until after Resolution of the Inequitable Conduct Issues (Oct. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3286093 (Trial Motion, Memorandum and

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1891807 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----)

Affidavit) Plaintiffs' Memorandum IN Support of their Motion for A Protective Order Concerning Defendant's First Set of Requests for Admission (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 2870783 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Osram's Response to Plaintiffs' Motion to Consolidate (Sep. 12, 2005) Original Image of this Document with Appendix (PDF)

• 2005 WL 2870788 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Osram's Opposition to Plaintiffs' Motion to Strike the Supplemental Expert Reports of Carlile R. Stevens and Lawrence J. Goffney (Sep. 12, 2005) Original Image of this Document with Appendix (PDF)

• 2005 WL 2870772 (Trial Motion, Memorandum and Affidavit) Osram's Opposition to Plaintiffs' Motion to Strike the Supplemental Expert Reports of Carlile R. Stevens and Lawrence J. Goffney (Sep. 7, 2005) Original Image of this Document with Appendix (PDF)

• 2005 WL 2870752 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Motion to Strike the Supplemental Expert Reports of Carlile R. Stevens and Lawrence J. Goffney (Sep. 2, 2005) Original Image of this Document (PDF)

• 2005 WL 2870764 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Consolidate (Sep. 2, 2005) Original Image of this Document (PDF)

• 2005 WL 2870776 (Trial Motion, Memorandum and Affidavit) Osrams' Response to Plaintiffs' Motion to Consolidate (Aug. 7, 2005) Original Image of this Document with Appendix (PDF)

• 2004 WL 2258010 (Trial Motion, Memorandum and Affidavit) Nilssen's Reply to Osram's Markman Brief (Feb. 20, 2004) Original Image of this Document (PDF)

• 2003 WL 23821140 (Trial Motion, Memorandum and Affidavit) Nilssen's Response to Osram's Rule 56.1 Statement of Undisputed Facts (Nov. 25, 2003) Original Image of this Document (PDF)

• 2003 WL 23821116 (Trial Motion, Memorandum and Affidavit) Osram's Markman Brief on Claim Construction and Response to Nilssen's Markman Brief (Nov. 21, 2003) Original Image of this Document (PDF)

• 2003 WL 23821122 (Trial Motion, Memorandum and Affidavit) Osram's Response to Nilssen's Statement of Undisputed Facts Pursuant to Local Rule 56.1 (Nov. 21, 2003) Original Image of this Document (PDF)

• 2003 WL 23821130 (Trial Motion, Memorandum and Affidavit) Osram's Response to Nilssen's Memorandum in Support of his Motion for Partial Summary Judgment of Infringement (Nov. 21, 2003) Original Image of this Document (PDF)

• 2003 WL 23821101 (Trial Motion, Memorandum and Affidavit) Nilssen's Memorandum in Support of His Motion for Partial Summary Judgment of Infringement (Oct. 24, 2003) Original Image of this Document (PDF)

• 2003 WL 23821107 (Trial Motion, Memorandum and Affidavit) Osram's Memorandum in Support of Its Motion for Summary Judgment (Oct. 24, 2003) Original Image of this Document (PDF)

• 2003 WL 23821092 (Trial Motion, Memorandum and Affidavit) Osram's Response to Nilssen's Motion to Compel Osram's Invalidity Contentions (Sep. 9, 2003) Original Image of this Document (PDF)

• 2002 WL 32683745 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Nilssen's Proposed Scheduling Order (Apr. 9, 2002) Original Image of this Document with Appendix (PDF)

• 1:01cv03585 (Docket) (May 15, 2001)

• 2001 WL 35695280 () Expert Report of John E. Maccrisken (2001) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.