# Illumina's assays do *not* indicate the relative strength of binding

## Court's Construction

12. The phrase "indicating an extent of hybridization," as used in the claims of U.S. Patent No. 5,795,716, means "indicating the relative strength of binding."

*Markman Order at ¶ 12*

## '716 Patent Claim 1

What is claimed is:

1. A computer program product that identifies an unknown base in a sample nucleic acid sequence, comprising:

computer code that receives a plurality of signals corresponding to probe intensities for a plurality of nucleic acid probes, each probe intensity indicating an extent of hybridization of a nucleic acid probe with at least one nucleic acid sequence including said sample sequence, and each nucleic acid probe differing from each other by at least a single base;

computer code that performs a comparison of said plurality of probe intensities to each other;

computer code that generates a base call identifying said unknown base according to results of said comparison and said sequences of said nucleic acid probes; and

a computer readable medium that stores said computer codes.

'716 Patent col. 41:69-67; 42:69-67

- Illumina's assays — perfect match and mismatch have *indistinguishable* strength of binding

- Illumina's assay intensities indicate the extent of enzymatic reaction, *not* relative strength of binding

# End-base mismatches do *not* typically show different strength in binding



No statistically significant difference in strength of binding

No statistically significant difference in strength of binding

Wick, L.M. et al. "On-chip nonequilibrium dissociation curves and dissociation rate constants as methods to assess specificity of oligonucleotide probes," 2006, Nucleic Acids Research 34(3): e26

Fig. 7

- Conditions must be optimized to detect any difference in strength of binding

- End mismatch has little to no effect on strength of binding, even for short probes

- Illumina's assays are designed to do the opposite — longer probes and conditions set to avoid any differences in strength of binding

# GoldenGate intensities do *not* "indicate an extent of hybridization" as required by claim 1

'716 Patent Claim 1

What is claimed is:

1. A computer program product that identifies an unknown base in a sample nucleic acid sequence, comprising:

computer code that receives a plurality of signals corresponding to probe intensities for a plurality of nucleic acid probes, each probe intensity indicating an extent of hybridization of a nucleic acid probe with at least one nucleic acid sequence including said sample sequence, and each nucleic acid probe differing from each other by at least a single base;

computer code that performs a comparison of said plurality of probe intensities to each other;

computer code that generates a base call identifying said unknown base according to results of said comparison and said sequences of said nucleic acid probes; and

a computer readable medium that stores said computer codes.

'716 Patent col. 41:59-67; 42:59-67



GoldenGate Assay

Tag sequence

Tag has exact same sequence for match or mismatch (*i.e.*, no difference in strength of binding)

# Array Matrix Not A "Biological Chip Plate"

## '531 Patent Specification

G. Biological Chip Plate: A device having an array of biological chips in which the probe array of each chip is separated from the probe array of other chips by a physical barrier resistant to the passage of liquids and forming an area or space, referred to as a "test well," capable of containing liquids in contact with the probe array.

'531 Patent col. 4:19-25

## NO separate "biological chips" on a plate



Array Matrix underside

# BeadChip Not A "Biological Chip Plate"

## '531 Patent Specification

G. Biological Chip Plate: A device having an array of biological chips in which the probe array of each chip is separated from the probe array of other chips by a physical barrier resistant to the passage of liquids and forming an area or space, referred to as a "test well," capable of containing liquids in contact with the probe array.

'531 Patent col. 4:19-25

NO separate
"biological chips"
on a plate



BeadChip

# Illumina's Array Matrix Does Not Have A "Wafer"

## '531 Patent, Claim 1

1. A method for making a biological chip plate comprising the steps of:

    \*    \*    \*

(b) providing a wafer comprising on its surface a plurality of probe arrays, each probe array comprising a collection of probes, at least two of which are different, arranged in a spacially defined and physically addressable manner;

*Claim 1, '531 Patent, col. 12:41-49*



**Array Matrix underside**

**Array Matrix topside**

# Illumina's Products Do Not Meet The Attaching Step According To Affymetrix's Own Expert

## Affymetrix's Expert Report

43.    Additionally, neither of the Chetverin references describes a method for

"attaching the wafer to the body so that the probe arrays are exposed to the spaces of the wells,"

as required by claims 1 and 2 or "applying a material resistant to the flow of the liquid sample so

as to surround the probe arrays, thereby creating test wells" as required by claims 3 and 4.

**Felder Report at ¶ 43**

## Chetverin '463 Patent

The sectioned array can also be created by applying a lattice to the solid support and bonding it to the surface so that each area is surrounded by impermeable walls. The technique of application of the lattice to the support is not critical; such means are well known in the art and include using adhesives and heat bonding.

**'463 Patent at col. 10:28-34**

### Fig. 3 of '463 Patent



## Illumina's Products -- NO "attaching"



Array Matrix

Microtiter plate



Bead Chip

Gasket

# Illumina Does Not Infringe The '531 Patent





**Array Matrix underside**

Fig. 3 of '463 Patent

- Not a biological chip plate

- No wafer with probes on its surface

- No attachment of accused "wafer" to body by Affymetrix's own expert

# "Encoding System" As Defined By The Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AFFYMETRIX, INC.,

    Plaintiff,

v.    Civil Action No. 04-901 JJF

ILLUMINA, INC.,

    Defendant.

O R D E R

1. The phrase "said beads being coded with an encoding system," as used in the claims of U.S. Patent No. 6,355,432, means "said beads having a property associated with each bead that can be used to distinguish one bead from another;"

2. The term "target specific sequence," as used in the claims of U.S. Patent No. 6,355,432, means "a known polymer sequence that has affinity for another sequence;"

3. The term "substrate," as used in the claims of U.S. Patent No. 6,646,243, means "a material having a rigid or semi-rigid surface;"

**property associated with the bead**

**separate from the binding polymer**



# Illumina's Beads Have No "Encoding System" Separate From The Binding Polymer



- Golden Gate/DASL bead address is <u>NOT separate from the binding polymer</u>

- Address has two functions:

1) capture assay products

2) used to decode array in manufacturing

# Illumina's Beads Have No "Encoding System" Separate From The Binding Polymer

## Infinium/Direct Hyb bead address is part of the binding polymer, NOT separate from it



Binding polymer

Gene-specific sequence

Address

## DNA on bead serves two functions:

- capture gene-specific sequences

- used for decoding in manufacturing

# '432 Patent Claims 2 And 9 Not Infringed Because No "Encoding System"





Gene-specific sequence

Address

- Address of the Infinium/ Direct Hyb assay beads are *not separate from binding polymer*

- Spatial location is *NOT a property associated with each bead* so it is not an "encoding system" under the Court's construction

# Illumina's GoldenGate Assay: Step 1



- Probes with P1 & P2 added to bind with sample nucleic acid adjacent to unknown base

- Locus specific nucleic acid with Tag sequence and P3 binds to downstream part of sample nucleic acid

# Illumina's GoldenGate Assay: Step 3



#1:  Sample nucleic acid washes off

#2:  Extension product is amplified (copied)

- Sample nucleic acid is separated from extension product and washed off

- Extension product is amplified (copied) and labeled



# GenCall Polar Transformation: Like Transforming Your Address Into Latitude/Longitude



GENCALL CARTESIAN GRAPH

y

(x,y)

x

GENCALL POLAR GRAPH

r

(θ, r)

Θ

DOWNTOWN WILMINGTON, DE

You are here

1100 U.S. Federal Courthouse
844 King Street
Wilmington, DE 19801

COURTHOUSE

You are here

39.7438 North Latitude
75.5477 West Longitude

Latitude

Longitude

# Illumina makes genotyping calls through transformation and clustering



MEASUREMENT OF PATIENT SAMPLE

TRANSFORM TO POLAR GRAPH

PLOT AGAINST CLUSTERS

# Illumina makes genotyping calls through transformation and clustering



Illumina makes genotyping calls through transformation and clustering

# Timeline of Applications Related to the '243 Patent

1960s-1970s

Nucleic acids on beads

1980

Commercial synthesis of oligonucleotides on beads

1989
Random arrays of encoded beads by others

March 1990
1st patent app. filed

March 1992
2nd patent app. filed

November 1992
3rd patent app. filed

1990

June 1995
4th patent app. filed

1995

August 1998
5th patent app. filed

April 1998
Illumina founded

October 2000
6th patent app. filed

March 2002
'243 patent app. filed
1st time claiming beads

July 2000
Illumina IPO

2000

Early 2001
Illumina launches decoded bead array product

2002



**Summary of Opinions**

# Evaluation of Patent Damages

- Reasonable royalties are appropriate

| | | |
|---|---|---|
| BeadArrays | 4.5% | $2,129,816 |
| Instruments | 2.0% | $521,377 |
| Services and research | 3.0% | $1,143,548 |
| | | **$3,794,742** |

(Through 2005)

129

**Reasonable Royalty**

# Overview of Analysis

- Profit apportionment

- Design alternatives

- *Georgia-Pacific factors*

130

**Reasonable Royalty**

# Overview of Analysis

- **Profit apportionment**

- Design alternatives

- *Georgia-Pacific factors*

133

**Profit Apportionment**

# Illumina's Profits Are Attributable to Many Factors

- Illumina's research and development

- Manufacturing processes and efficiencies

- Marketing, sales and distribution expertise

- Brand and reputation

- Other patented technology

**Profit Apportionment**

# Illumina's Profits Are Attributable to Many Factors

- **Illumina's research and development**

- Manufacturing processes and efficiencies

- Marketing, sales and distribution expertise

- Brand and reputation

- Other patented technology

134

138

**Profit Apportionment**

# Illumina's Profits Are Attributable to Many Factors

- Illumina's research and development

- **Manufacturing processes and efficiencies**

- Marketing, sales and distribution expertise

- Brand and reputation

- Other patented technology

140

**Profit Apportionment**

# Illumina's Profits Are Attributable to Many Factors

- Illumina's research and development

- Manufacturing processes and efficiencies

- **Marketing, sales and distribution expertise**

- Brand and reputation

- Other patented technology

**Profit Apportionment**

# Illumina's Profits Are Attributable to Many Factors

- Illumina's research and development

- Manufacturing processes and efficiencies

- Marketing, sales and distribution expertise

- **Brand and reputation**

- Other patented technology

144

**Profit Apportionment**

# Illumina's Profits Are Attributable to Many Factors

- Illumina's research and development

- Manufacturing processes and efficiencies

- Marketing, sales and distribution expertise

- Brand and reputation

- **Other patented technology**

# Illumina's Patents

We have an extensive patent portfolio, including, as of February 1, 2006, ownership of, or exclusive licenses to, 38 issued U.S. patents and 102 pending U.S. patent applications, including six allowed applications that have not yet issued as patents, some of which derive from a common parent application. Our issued patents, which cover various aspects of our array, assay, oligo synthesis, instrument and chemical detection technologies, expire between 2011 and 2022.

Affymetrix v. Illumina
CA No. 04-901-JJF
Trial Exhibit
DX 1516

Source:  Illumina's 10-K Form (Mar. 6, 2006)

145

# Profit Apportionment

## Tufts

- Worldwide, exclusive license

- Licenses patented technology underlying Illumina's accused products

- 3% royalty on net sales of beadarrays



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY

146

150

**Reasonable Royalty**

# Overview of Analysis

- Profit apportionment

- **Design alternatives**

- *Georgia-Pacific factors*

**Design Alternatives**

# Overview

- Represents a cap as to what Illumina would be willing to pay for license

- Total cost to Illumina to implement is less than $7 million

151

152

**Design Alternatives**

# '716 Patent

- No conversion step (Cartesian coordinates)

  - 2002 cost is $75,000

    OR

- Eliminate base call reporting

  - Minimal expense because commercially used previously

**Design Alternatives**

# '531 Patent

- One array per solid support
- 2002 cost is several million dollars

153

154

**Design Alternatives**

# '365 Patent

- Non-barcode identification system
  - 2002 cost is less than $0.5 million

**Design Alternatives**

# '243 Patent

- White light with filters
  - 2002 cost is less than $3 million

    **OR**

- Nanocrystals

    **OR**

- Non-covalent attachment
  - 2002 cost is less than $0.5 million

155

156

**Reasonable Royalty**

# Overview of Analysis

- Profit apportionment

- Design alternatives

- *Georgia-Pacific factors*

# Licenses to Comparable Patents

## PHRI

- Worldwide license

- Licenses patented array technology comparable at least to the '531 patent

- 0.7% royalty rate





**LICENSE AGREEMENT**

This Agreement, effective on the last date executed by one of the signatories hereto, is between, the Public Health Research Institute of the City of New York, Inc., a non-for-profit corporation of the State of New York having laboratories at 455 First Avenue, New York, NY 10016 (*PHRI*) and Affymetrix, Inc., a corporation of the State of California having offices at 3380 Central Expressway, Santa Clara, CA 95051 (*AFFYMETRIX*), collectively *the Parties.*

**BACKGROUND**

A. PHRI owns patent applications relating to oligonucleotide arrays and methods employing such arrays, as hereinafter defined.

B. AFFYMETRIX's business includes developing, manufacturing and selling chips that include arrays of bound oligonucleotides and kits containing such chips.

C. AFFYMETRIX desires a exclusive exclusive license under said PHRI arrays patent applications and patents issuing therefrom

D. PHRI owns patent applications relating to labeled oligonucleotides referred to by PHRI as 'molecular beacons' and to assays and kits employing said molecular beacons and to certain fluorescence/donor/other pairs for oligonucleotide probes.

HIGHLY CONFIDENTIAL, ATTORNEY'S EYES ONLY

Affymetrix (Thermo)
v. Illumina JJF
Trial Exhibit
**DX 772**

PHRI 00721

# Affymetrix Changed The Algorithm For Its Genotyping Product

Schiffman pointed out in May that the problems with the company's initial algorithm had created scale-up issues for Affy customers which, in turn, affected the timing of reorders.

"[With the older software] there was a larger degree of disparity between heterozygote calls and homozygote calls," Schiffman told the investors.

Source: "Algorithm And Blues New Software Enables Affy to Cut 500k Price Tag, But Investors Left Spooked," BioArray News (July 25, 2006)

182

# Known Shortcomings in Affymetrix's Genotyping Software



"The previous algorithm tended to under-call heterozygotes, which could have introduced a bias in downstream analysis," he said.

Source: "Algorithm And Blues: New Software Enables Affy to Cut 500k Price Tag, But Investors Left Spooked" BioArray News, July 25, 2006

**Summary**

# Reasonable Royalties

|  | Rate | Royalty Base | Royalties |
|---|---|---|---|
| BeadArrays | 4.5% | $47,329,254 | $2,129,816 |
| Instruments | 2.0% | $26,068,872 | $521,377 |
| Services and research | 3.0% | $38,118,264 | $1,143,548 |
|  |  |  | $3,794,742 |

(Through 2005)

196

**Lost Profits Is Not Appropriate**

# Availability of Design Alternatives

- Illumina had design alternatives available

- Competitive technologies exist for which Dr. Lynde does not properly account

## Capacity Constraints



So although we'd have yield issues, we always had a lot of capacity. That wasn't the case in the second half of 2005.

Source: Siegel Dep., at 150:5-8



# Correcting for Capacity Constraints

**Overstates Lost Profits**

$9.2MM Correction

$25,000,000

$20,000,000

$15,000,000

$10,000,000

$5,000,000

$0

Dr. Lynde's Lost Profits

Dr. Lynde's Lost Profits Corrected for Capacity Constraints

215

## Overstates Lost Profits

## Correcting for Lost Profits Claim for Instruments

**$4.5MM Correction**

$14,450,394

$9,952,294

Dr. Lynde's Lost Profits Corrected for Capacity Constraints

Additional Correction for Claim of Lost Profits on Instruments

$25,000,000
$20,000,000
$15,000,000
$10,000,000
$5,000,000
$0

217

Overstates Lost Profits

# Correcting for Lost Profits Claim For Incorrect Identification of Competitive Products

$8.2MM Correction

$9,952,294

$1,759,536

Dr. Lynde's Lost Profits Corrected for Capacity Constraints, Lost Profits on Instruments

Additional Correction of Dr. Lynde's Claims

$25,000,000
$20,000,000
$15,000,000
$10,000,000
$5,000,000
$0

219

## Correcting Dr. Lynde's Incremental Margin

**Overstates Lost Profits**

$0.66MM Correction

$1,759,536

$1,100,368

Dr. Lynde's Lost Profits Corrected for Capacity Constraints, Lost Profits on Instruments, Adjusted Products

Additional Correction for Dr. Lynde's Incremental Margins

$25,000,000

$20,000,000

$15,000,000

$10,000,000

$5,000,000

$0

**Overstates Lost Profits**

# Lost Profits Summary

- If lost profits are appropriate, corrections to Dr. Lynde's lost profits calculation are necessary

- Correcting for these errors reduces Dr. Lynde's lost profits claim by **$22,575,632** through 2005

- Dr. Lynde's lost profits claim should be adjusted to be no more than **$1,100,368** through 2005

222

# Takara-Shuzo Sought to Renegotiate

Given the deleterious impact that the activities of Agilent and others have had on Takara Bio's market for the past half-year or more, we do not believe that we should have an obligation to make the minimum royalty payments until such time as the activities of all non-licensees have ceased and we are able to engage in the sale of microarray products under the fair market conditions contemplated by the License Agreement.



Highly Confidential - Attorneys' Eyes Only

AVI_205406

**Overstates Reasonable Royalty Damages**

# Genomic Solutions

- Does not license any of the patents-in-suit

- Licenses 155 other Affymetrix patents and patent applications

- Genomic Solutions sought to renegotiate the terms to reduce the financial burden

232

# Genomic Solutions Sought to Renegotiate

**GENOMIC**
**SOLUTIONS℠**
FUELING INNOVATION,
DRIVING DISCOVERY.℠

July 10, 2002

Affymetrix, Inc.
Anne Bowdidge

Via Telecopy and Regular Mail

it will be impossible to recover our investment to date under the current license terms.

market pricing has deteriorated to the point that

Highly Confidential - Attorneys' Eyes Only

EXHIBIT

Affymetrix v. Illumina
C.A. No.04-901 JJF
Trial Exhibit
DX 1038

AVI_204933

233



Overstates Reasonable Royalties

Reasonable Royalty Assuming No Lost Profits Award

$12.3MM Correction

Dr. Lynde's Reasonable Royalty Assuming No Lost Profits

Reasonable Royalty Assuming No Lost Profits

$20,000,000

$16,000,000

$12,000,000

$8,000,000

$4,000,000

$0

241

Overstates Reasonable Royalties

# Reasonable Royalty Assuming Lost Profits Award

$8.4MM Correction

Dr. Lynde's Reasonable Royalty Assuming Lost Profits Award

Reasonable Royalty Assuming Lost Profits Award

$16,000,000

$12,000,000

$8,000,000

$4,000,000

$0

242

243

**Summary of Opinions**

# Evaluation of Patent Damages

|  | Rate | Royalties |
|---|---|---|
| BeadArrays | 4.5% | $2,129,816 |
| Instruments | 2.0% | $521,377 |
| Services and research | 3.0% | $1,143,548 |
|  |  | $3,794,742 |

(Through 2005)